# Exhibit D

# Richmond CARES

## *Community Action to Restore Equity and Stability*

Saving Homes, Saving Cities

Solving the Mortgage Crisis Locally

Mortgage Resolution
**PARTNERS**

2

## Summary

- An average foreclosure costs the local government $19,277 (HUD)

- An average foreclosure costs adjacent neighbors $14,531 (HUD)

- 1,468 first mortgages in Richmond are in Private Label Securities

- 734 of these will be foreclosed (Fannie Mae estimate)

- These foreclosures will cost Richmond $25 million

- Reducing principal to below home values will stop foreclosures

- Richmond has the power to reduce principal

- *No one else has any incentive to prevent foreclosures*

- Mortgage Resolution Partners can help

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

Mortgage Resolution
P A R T N E R S

# The Cost of a Foreclosure*

Local Governments    $19,227

- Lost Property Taxes
- Unpaid Utility Bills
- Property Upkeep
- Policing
- Legal costs, building inspections
- Demand for social services

Borrowers    $10,300**

Close Neighbors    $14,531***

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

*HUD Economic Impact Analysis of the FHA Refinance Program for Borrowers in Negative Equity Position
**Household moving costs, legal fees and administrative charges
***Negative impact on the property value of close neighbors

3

Mortgage Resolution
**PARTNERS**

# Richmond Foreclosures

Cost of Foreclosures

| Housing | # of Units* | Private Label Mortgages | Future Foreclosures Of Private Label Mortgages** | Richmond | Adjacent Neighbors |
|---|---|---|---|---|---|
| Owner-occupied | 18,659 | 1,468 | 734 | $14 million | $11 million |
| Renter-occupied | 17,434 | | | | |

**Fannie Mae Predicts that 50% of PLS Will Result in Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

*Source: 2010 Census
** Source: Fannie Mae 2011 10k

4

Mortgage Resolution
**PARTNERS**

Problem → Mortgages Held In Private Label Securities

- 4.5 million loans placed in securities not guaranteed by U.S. Government
- Loans not eligible for 15 federal programs created since the housing crash
- Loans are much more likely to be underwater.
- Riskier loans created in 2004 to 2007 helped create housing boom
- Have not been originated since 2007
- *Securities prohibit principal reduction*

"If we are going to stabilize the housing market, we have to address" PLS loans.

*Federal Housing Finance Agency 2009*

Result → Fannie Predicts that 50% of PLS Will Result in Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

5

Mortgage Resolution
**PARTNERS**

# The Solution – Principal Reduction

*"Most economists see* principal reductions *as central to preventing foreclosures." Alan Blinder, former Vice Chairman at the Federal Reserve (Oct. 20, 2011)*

*"Government should* reduce mortgage principal *when it exceeds 110 percent of the home value." Martin S. Feldstein, former Chairman of the Council of Economic Advisers under President Reagan (Oct. 12, 2011)*

*"Surely there is a strong case for experimentation with* principal reduction *strategies at the local level." Lawrence Summers, former Treasury Secretary under President Clinton and former Economic Adviser under President Obama (Oct. 24, 2011)*

**Example: JP Morgan Chase and Bank of America** unilaterally reduce principal **on option ARM portfolio loans in order to** reduce defaults and losses

Principal reduction will prevent future defaults and foreclosures

Mortgage Resolution
P A R T N E R S

# Why Does Principal Reduction Help?

This is an illustrative example for the level of benefits that participating families may realize. Communities benefit from greatly reduced probability of foreclosure.

| | Original Loan | Today | After Program |
|---|---|---|---|
| Home Value | $400,000 | $200,000 | $200,000 |
| Mortgage Balance | $320,000 | 300,000 | $190,000 |
| Home Equity | $80,000 | ($100,000) | $10,000 |
| Loan to Value Ratio (LTV) | 80% | 150% | 95% |
| Monthly Payment | $1,798 | $1,798 | $907 |

*Assumes a 6%, 30 year, fully amortizing mortgage is refinanced by a 4%, 30 year, fully amortizing mortgage. Some loan programs may also require insurance, which may add $175 per to the After Program monthly payment.*

Probability of Default Drops from ~80% to ~7.5% (FHA actuarial assumption, 95%LTV)

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 201 | San Francisco, CA 94111 | 415.795.2032

7

Mortgage Resolution
**PARTNERS**

# Method of PLS Principal Reduction → Communities Take Action

Securitization agreements and tax laws prohibit the sale of PLS mortgages except when the mortgages are condemned

Local government, using their constitutional power of eminent domain, can purchase PLS mortgages when public purpose exists by paying fair value

Then local governments can reduce the principal balance on the condemned PLS mortgages, thereby reducing underwater PLS in their community

Governments Can Use Eminent Domain To Avoid Unnecessary Foreclosures

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

8

Mortgage Resolution
**PARTNERS**

# Who Supports the Program?

Broad community-focused support for the program

- AFSCME
- Americans for Financial Reform
- Center for Popular Democracy
- National Community Reinvestment Coalition
- Federal Banking Regulators

Representing

- 1.6 million state and local government employees
- 600 local housing focused organizations
- 250 national, state and local groups working on financial industry reform

Program Addresses Concerns Of Local Homeowners And Community-focused Organizations

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

9

Mortgage Resolution
**PARTNERS**

# MRP is a Community Advisory Firm

MRP clients are state, county, and city governments that purchase underwater PLS mortgages and resolve them to the benefit of their communities. In order, MRP provides, under an advisory contract with the community, the following services:

- Identify and value PLS mortgages

- Educate the community

- Arrange acquisition financing

- Advise community in filing eminent domain motion

   Demonstrate the public purpose

   Determine fair market value of mortgages

- Arrange servicing of acquired mortgages

- Arrange resolution of acquired mortgages

MRP Provides These Services No Cost To Cities or Homeowners

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

10

# Communities That Have Engaged MRP

- El Monte, CA
- La Puente, CA
- San Joaquin, CA
- Orange Cove, CA

MRP is in active discussions with these communities and many more

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

11

Mortgage Resolution
PARTNERS

# Next Steps

1. The City retains MRP at no cost per the terms of the MRP Advisory Agreement as modified by the City and agreed to by MRP.

2. The City is in control, at each step in the process the City has the option to terminate the Agreement and must approve the next step before it is taken.

3. The City does not pay any costs of the program.

4. Nothing in the Agreement obligates the City to file an eminent domain motion.

Mortgage Resolution Partners LLC
Pier 33 South Embarcadero, Suite 2011 San Francisco, CA 94111 | 415.795.2032

12

Mortgage Resolution
PARTNERS

# Key Steps To The MRP Process

1. The City hires MRP at no cost per the terms of the MRP Advisory Agreement as modified by the City and agreed to by MRP. At each step in the process the City has the option to terminate the Agreement and must approve the next step before it is taken. The City does not pay any costs of the program. Nothing in the Agreement obligates the City to file an eminent domain motion.

2. The City pre approves all communications with the homeowners and the community.

3. Before or after the City files an eminent domain motion the Homeowner may opt out of the program and their mortgage will be dropped from the motion before it is purchased.

4. Qualified homeowners who opt into the program may elect to refinance for less than the current value of their home.

5. Qualified homeowners who opt into the program may elect to sell their home in full satisfaction of their mortgage and lease back their home with an option to purchase it in the future.

6. Homeowners who opt into the program, but do not qualify for a refinance or a lease will be dropped from the eminent domain motion before their mortgage is purchased.

Step 1. City Controls The Process

Mortgage Resolution
**PARTNERS**



14

# Step 2. Home Owner May Opt Out

Mortgage Resolution PARTNERS



Mortgage Resolution
**PARTNERS**

# Step 3: Lease/Purchase Solution



**PLS Trustee**

- Receives $160,000 Agreed Upon Fair Market Value of Underwater PLS Mortgage
- Delivers Underwater PLS Mortgage

**Funder**

- Funds $160,000 Loan Acquisition Price

**City**

- Obtains Order For Possession of Mortgage
- Invests $9,500 to stabilize local housing
- Applies for CHFA Grant

**Mortgage Servicer/ Title Company**

- Holds Underwater PLS Mortgage For City/Funder
- Receives $190,000
- Underwater Mortgage Paid Off
- Sends $9,500 to City (5%)
- Sends $4,750 to Realtor representing Seller (2.5%)
- Sends $175,750 to Funder

**Home Buyer**

- Signs Lease, Buys Home When City Owns PLS Mortgage
- Sends $190,000 home purchase price to servicer
- Credits a portion of rent to tenant's purchase account

**Home Owner**

- Selects a Local Realtor as advisor
- **Start:** Home Owner Opts For Lease/Purchase
- Signs a market rate lease with an option to purchase. Sells home to buyer.
- Pays rent
- May buy home or continues to rent

- Pays $3,260 of other expenses
- Pays $4,500 to MRP

16



Step 3: Refinance Solution

Mortgage Resolution
PARTNERS

17

# Follow the Money

Mortgage Resolution **PARTNERS**

| Sale and Leaseback Solution | Who Pays? | When? | Who is Paid? | Cash Flow | MRP Cash Balance | Funder Cash Balance |
|---|---|---|---|---|---|---|
| Legal Expenses | MRP | Before eminent domain motion is filed | Atty's selected by City | (300) | (300) | |
| 50% of MRP Fee | Funder | Eminent domain motion filed | MRP | (2,250) | 1,950 | (2,250) |
| Legal Expenses | Funder | After eminent domain motion is filed, prior to possession being awarded | Atty's selected by City | (1,700) | 250 | |
| Fair Value Paid For Loan | Funder | Possession of mortgage awarded to city | PLS Trust | (160,000) | | (162,250) |
| Real Estate Commission | Home Buyer | Home sold | Realtors selected by home owner | (4,750) | | |
| Closing Costs | Home Buyer | Home sold | Vendors selected by home owner/realtor | (2,000) | | |
| Home Sales Proceeds | Home Buyer | Home Sold | Funder | 183,250 | | 21,000 |
| Community Housing Reserve | Funder | Home Sold | City | (9,500) | | 11,500 |
| 50% of MRP Fee | Funder | Home Sold | MRP | (2,250) | 2,500 | 9,250 |
| Investment Banking Fee | Funder | Home Sold | MRP's investment bank | (560) | | 8,690 |
| Reimbursement of MRP Advances | Funder | Home Sold | MRP | (2,000) | 4,500 | 6,690 |

| Refinance Solution | Who Pays? | When? | Who is Paid? | Cash Flow | MRP Cash Balance | Funder Cash Balance |
|---|---|---|---|---|---|---|
| Legal Expenses | MRP | Before eminent domain motion is filed | Atty's selected by City | (300) | (300) | |
| Homeowner Education | MRP | Before eminent domain motion is filed | Vendor approved by City | (300) | (600) | |
| 50% of MRP Fee | Funder | Eminent domain motion filed | MRP | (2,250) | 1,650 | (2,250) |
| Legal Expenses | MRP | After eminent domain motion is filed, prior to possession being awarded | Atty's selected by City | (1,650) | - | |
| Homeowner Education | MRP | After eminent domain motion is filed, prior to possession being awarded | Vendor approved by City | (300) | (300) | |
| Fair Value Paid For Loan | Funder | Possession of mortgage awarded to city | PLS Trust | (160,000) | | (162,250) |
| Mortgage Servicing | Funder | After possession of mortgage by city until resolution | Servicer of underwater mortgage | (100) | | (162,350) |
| Refinance Proceeds | FHA Lender | Refinance Completed | Funder | 190,000 | | 27,650 |
| Community Housing Reserve | Funder | Refinance Completed | City | (9,500) | | 18,150 |
| 50% of MRP Fee | Funder | Refinance Completed | MRP | (2,250) | 1,950 | 15,900 |
| Investment Banking Fee | Funder | Refinance Completed | MRP's investment bank | (560) | | 15,340 |
| Reimbursement of MRP Advances | Funder | Refinance Completed | MRP | (2,550) | 4,500 | 14,780 |

# Exhibit E

## ADVISORY SERVICES AGREEMENT

This Advisory Services Agreement ("Agreement") is entered into by and between Mortgage Resolution Partners LLC, a Delaware limited liability company ("MRP") and the City of Richmond, a municipal corporation and charter city (the "City") and is effective as of _____, 2013 (the "Effective Date").

### RECITALS

A. MRP is a community advisory firm advising public agencies on ways to assist the agency in reducing the impact of the mortgage crisis with its communities including, if necessary, by acquiring mortgage loans through the use of eminent domain, in order to restructure or refinance the loans and thereby preserving home ownership, restoring homeowner equity and stabilizing the communities' housing market and economy by allowing many homeowners to remain in their homes.

B. America in general and the City in particular are each experiencing an historic home mortgage crisis and as a result of the home mortgage crisis, many homeowners in the City have lost significant portions of their disposable income, and some have been unable to make timely mortgage payments on their homes. This has resulted in unprecedented rates of default and foreclosure, loss of homeowner equity, loss of family wealth, and even loss of shelter for some families. The home mortgage crisis has resulted in other adverse impacts within the City such as job losses, reductions in income, consumer demand, and investment, a spiraling reduction in property values, a reduction in property and payroll tax revenues, vandalism, abandoned homes and a general decline in the economy and the quality of life for residents. Restructuring or refinancing mortgage loans will benefit the City's residents by preserving home ownership; restoring homeowner equity; and likely also increasing income, property values, consumer demand, investment, and property and payroll tax revenue.

C. The City is interested in retaining MRP to act as its advisor to assist the City in exploring potential solutions to the mortgage crisis; to assist the City by negotiating on the City's behalf with entities which will provide the necessary funding to the City in order to allow the City to acquire loans; and to assist the City in negotiating contracts with third parties including owners of loans, attorneys, lenders, data companies, other government agencies and others as necessary to implement a program or programs to benefit the City's residents.

NOW THEREFORE, in consideration of the foregoing, MRP and the City agree as follows:

1. PURPOSE. The purpose of this Agreement is to enable the City and MRP to work together to assess and implement a program or programs designed to ease the impacts of the mortgage crisis on the residents of the City.

2.    SERVICES. MRP agrees to provide the following services ("Services"), and the City authorizes MRP to represent the City as described:

(a)    to advise the City on various alternatives in order to provide assistance to its residents who are burdened with mortgage loans including assessing the possibility and benefits of the formation of a joint powers authority;

(b)    to identify and negotiate with companies acceptable to the City, in City's sole and absolute discretion, to lend funds to the City on a fully secured, non-recourse basis if such funds are required in order to provide the necessary relief;

(c)    to provide extensive legal research acquired by MRP on all aspects of the acquisition and refinancing of mortgage loans including each of the legal steps necessary to implement the necessary programs;

(d)    to identify and negotiate with law firms acceptable to the City, in City's sole and absolute discretion, to work with the City to implement the programs which the City elects to implement;

(e)    to negotiate with other local, state and federal governments and agencies as necessary to implement programs chosen by the City;

(f)    to negotiate on behalf of the City with the holders of mortgage loans secured by property owned by residents of the City (and with trustees, servicers, investors and other parties having a relationship with the holders of the loans);

(g)    to work with the City to identify mortgage loans to target based upon the City's criteria;

(h)    to negotiate on behalf of the City with any other third party as necessary to implement programs which the City elects to implement; and

(i)    to work with the City to establish education and communication programs to address residents' questions about a program or programs the City implements.

Provided, however, MRP shall not take action or implement programs or tasks set forth in subsection (b), (d), (e), (f) and (h) hereof without the express written consent of City in advance, which consent may be withheld in the City's sole and absolute discretion. Provided further, however, in no event shall MRP have the authority to enter into any contracts on behalf of the City.

3.    COMPENSATION. As its sole and exclusive compensation for the performance of the Services (the "Advisory Fee"), MRP shall receive the sum of $4,500 per loan for each loan ultimately acquired by the City or otherwise resolved in a manner which results in the restructuring or refinancing of a loan through a program implemented by the City. The Advisory Fee shall be paid only through the programs implemented by the City and shall not be paid directly by the City. City shall not be responsible for any cost or expense arising out of or related to this Agreement or any program or programs the City implements.

**#I-11.**

4.    ASSIGNMENT.  MRP shall not have the right to assign and/or delegate its duties hereunder without the prior written consent of City, which consent may be withheld in the City's sole and absolute discretion.

5.    COOPERATION.  Each party agrees to cooperate to carry out the purpose of this Agreement and to perform all acts and execute all documents reasonably required to institute the programs chosen by the City pursuant to the terms of this Agreement or as are or may become necessary or convenient to effectuate and carry out this Agreement.

6.    RELATIONSHIP OF PARTIES.  The relationship of MRP to the City shall at all times be that of an independent contractor.  MRP expressly acknowledges and agrees that it does not have the authority to bind the City by contract or otherwise.

7.    TERM.  This Agreement shall be in effect for a period of one (1) year from the Effective Date and will be renewed automatically for successive terms of one (1) year each unless either party gives notice to the other at least sixty (60) days prior to the termination of any term.  Upon any such termination, this Agreement shall be null and void and of no further force or effect, except as to those provisions which expressly survive the termination of the Agreement.

8.    INDEMNITY.

(a)    Except to the extent caused by the sole active negligence or willful misconduct of City, City and City's representatives shall not be liable for any liability, penalties, costs, losses, damages, expenses, causes of action, claims or judgments, including attorney's fees and other defense costs (collectively, "Claims"), resulting from injury to or death sustained by any person, or damage to property of any kind, or any other injury or damage whatsoever, which Claims arise out of or are in any way connected with this Agreement or any programs or tasks implemented pursuant to this Agreement.

(b)    Except to the extent caused by the sole active negligence or willful misconduct of City, MRP shall indemnify, protect, defend and hold the City and its representatives, harmless of and from any and all Claims arising out of or in any way related to or resulting directly or indirectly from (i) this Agreement, (ii) the programs or tasks implemented pursuant to this Agreement, (iii) any failure to comply with any applicable law, and (iv) any default or breach by MRP in the performance of any obligation of MRP under this Agreement.

(c)    The provisions of this Section 8 shall survive the expiration or sooner termination of this Agreement.

9.    INSURANCE. Upon receiving approval from the City to take action or implement programs or tasks set forth in subsection (b) of Section 2, MRP, at its own cost and expense, shall provide and maintain insurance coverage as required in Exhibit A, "City of Richmond Insurance Requirements – Type II: Professional Services". MRP shall submit current certificates of insurance for the policies required in this Section 9 before taking action or implementing any programs or tasks set forth in subsections (b), (d), (e), (f) and (h) of Section 2.

10.     GENERAL PROVISIONS.

(a)     Execution. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original. A signature transmitted via scanning and emailing or facsimile shall have the same effect as an original signature.

(b)     Modification of Agreement. This Agreement may be modified only by a writing signed by MRP and the City.

(c)     Entire Agreement. This Agreement together with any Nondisclosure and/or Common Interest Agreements entered into between the parties either prior or subsequent to the Effective Date constitute the entire understanding and agreement between the parties concerning this subject matter.

(d)     Severability. If a court of competent jurisdiction finds or rules that any provision of this Agreement is invalid, void, or unenforceable, the provisions of the Agreement not so adjudged shall remain in full force and effect. The invalidity in whole or in part of any provision of this Agreement shall not void or affect the validity of any other provision of this Agreement.

(e)     Governing Law. This Agreement is governed by and shall be interpreted according to the laws of the State of California. This Agreement is made in Contra Costa County, California, and any action relating to this Agreement shall be instituted and prosecuted in the courts of Contra Costa County, California.

(f)     Waiver of Breach. No waiver of breach of any term or provision of this Agreement shall be construed to be, or shall be, a waiver of any other breach of this Agreement.

(g)     Arms-Length Transaction. This Agreement is a product of arms-length negotiations and each party has had an opportunity to receive independent legal advice from attorneys of its own choosing. Thus, neither party can claim that any ambiguities in any term of this Agreement should be construed against any other party.

(h)     No Third Party Beneficiaries. This Agreement will not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and permitted assigns.

11.     NOTICES. All notices under this Agreement shall be in writing and shall be transmitted by personal delivery or reputable overnight courier service such as FedEx to the parties at the following addresses:

**#I-11.**

MRP:
Mortgage Resolution Partners, LLC
33 Pier South Embarcadero, Suite 201
San Francisco, CA 94111
Attn: CEO

The City:
450 Civic Center Plaza
Richmond, CA 94804
Attn: City Manager

With copy to:

450 Civic Center Plaza
Richmond, CA 94804
Attn: City Attorney

Such notice shall be deemed given upon personal delivery to the appropriate address or on the next business day if sent by overnight courier service.

WHEREFORE, the parties indicate by their signatures below their entry into this legally-binding Agreement.

The City

_____

(signature)                                    (date)

Name (printed):       _____

Mailing address:      _____

Telephone no.:        _____

E-mail address:       _____

Date of Signing:      _____

Attest

_____

City Clerk

Approved as to form:

_____

City Attorney

Mortgage Resolution Partners LLC

Representative: _____
               (signature)                        (date)

Name (printed):     Graham Williams

Mailing address:    33 Pier South Embarcadero, Suite 201, San Francisco, CA 94111

Telephone no.:      415-795-2032

E-mail address:     gwilliams@mortgageresolutionpartners.com

Date of Signing:   _____

# Exhibit F

Session was called to order at 5:32 p.m.

## ROLL CALL

**Present:** Councilmembers Beckles, Butt, Myrick, and Mayor McLaughlin. **Absent:** Councilmember Bates, Rogers, and Vice Mayor Boozé arrived after the City Council adjourned to Closed Session.

## PUBLIC COMMENT

The deputy city clerk announced that the purpose of the Evening Open Session was for the City Council to hear public comments on the following items to be discussed in Closed Session:

## CITY COUNCIL

**CONFERENCE WITH LEGAL COUNSEL - ANTICIPATED LITIGATION (Initiation of litigation pursuant to Subdivision (c) of Government Code Section 54956.9):**

One Case

**There were no public speakers.**

The Evening Open Session adjourned to Closed Session at 5:33 p.m. The Closed Session adjourned at 6:28 p.m.

The Regular Meeting of the Richmond City Council was called to order at 6:30 p.m. by Mayor McLaughlin who led the Pledge of Allegiance to the Flag.

## ROLL CALL

**Present:** Councilmembers Bates, Beckles, Butt, Myrick, Rogers, and Mayor McLaughlin. **Absent:** Vice Mayor Boozé, was absent during Roll Call..

## READING OF THE CODE OF ETHICS

Deputy City Clerk Ursula Deloa read the Code of Ethics.

## STATEMENT OF CONFLICT OF INTEREST

None.

the Consent Calendar; continued Item I-10 to April 16,
2013; and withdrew Item J-1 from the agenda to be
agendize on the April 16, 2013, City Council Agenda
under Closed Session.

## OPEN FORUM FOR PUBLIC COMMENT

Yolanda Jones expressed disappointment that
her business was not included on the small business
certified contractor's list.

Charlie Walker expressed disappointment that
black contractors are not given the opportunities to
work on projects in Richmond.

Antwon Cloird gave comments that another
councilmember apologized for comments made by a
councilmember. He stated that councilmembers must
respect one another.

Henry Parker invited everyone to the Second
Annual "Reach for the Stars" Full Inclusion Fashion
Show and Showcase working with children on the
Autism spectrum, being held April, 27, 2013, at
Lavonya Dejean Middle School, 3400 Macdonald
Avenue, from 5:30p.m. to 9:00 p.m. tickets are $10.00.

Joseph Puleo gave comments regarding the
behavior of Human Resources Director and Assistant
City Manager Leslie Knight and the lack of discipline
for her behavior due to double-standards.

Etta Jones expressed disappointment that
Yolanda Jones Construction Company was omitted
from the small business certified contractor's list. She
encouraged the city council to make sure that it does not
happen again.

Kathleen Wimer stated that those on the public
payroll must act above not only impropriety but above
the appearance of impropriety. Ms. Wimer stated that
the City of Richmond cannot have a reputation as being
corrupt for our own future together. Therefore,
whatever discipline was imposed on Ms. Knight's
employment has to correct and extinguish this
appearing of impropriety without granting any
preferential treatment.

Alpha Buie gave comments regarding the plight
of young African Americans seeking employment
specifically ex-offenders returning to the community.
She stated that many African American contractors are
excluded from lists to bid for funding for their
programs.

He encouraged the City Council to exam the issue so that residents in the area were able to enjoy the park also.

Stacie Plummer gave comments regarding the Richmond Charter. She stated that charter was created by the Richmond voters based on an unwavering foundation of public trust. Ms. Plummer stated that the charter starts with where the city manager must live, the prosecutorial duties of the city attorney, and entrust powers and duties of the City Council, and Personnel Board. She also stated that trust cannot be off-limits to the people. Ms. Plummer also stated that a debate regarding public trust began with City Manager Bill Lindsay's press release.

Jackie Thompson stated that permits for soccer were issued for certain sections of Booker T. Anderson Park; however, the entire park was being used for soccer. Ms. Thompson also stated that bullying can be physical, mental, and emotional. She encouraged the City Council to review the Personnel Rules. She also stated that department heads should establish employee anti-bullying training.

Wesley Ellis stated that Councilmember Beckles should not flatter herself by thinking she could hurt his feelings. He stated that the rift between he and Councilmember Beckles began when she told him that he did not have a clue about anything, and called his name out among all the citizens seated in the Council Chambers.

Stan Fleury thanked Mayor McLaughlin and Councilmember Beckles for having the courage to start a discussion among the leadership of the City of Richmond regarding current issues taking place within the City of Richmond. Mr. Fleury stated that it was with great peril that issues were brought fourth to the City Council, and he encouraged the City Council to help employees and continue to listen to what they have to say.

Niechelle Gordan stated that she was trying to acquire a new business license within the City of Richmond and left a message with the appropriate department; however, no one returned her call. Mr. Lindsay will follow-up with the department.

Lalo Herrera gave comments regarding Human Resources Director and Assistance City Manager Leslie Knight stating she was the worst offender of the City's policies and procedures.

Andre Soto congratulated Councilmember

undermines the credibility of management and he hopes that issues are resolved in a fair and equitable manner that preserves the integrity of city government.

Raymond Dryer thanked the City Council for pulling the resolution regarding Human Resources Director and Assistance City Manager Leslie Knight and taking the issue to Closed Session to hear the report in its entirety. Mr. Dryer stated that as children you learn that taking something that does not belong to you was theft, and encouraged the City Council to following through with a proper decision.

Michael Beer stated that there will not be a Silly Parade this year and thanked the many organizations and individuals for past support.

Bea Roberson encouraged citizens to attend the Marine Clean Energy (MCE) Meeting, Monday, April 22, 2013, from 6:30 p.m. to 8:30 p.m. in the Multipurpose Room at Levone De Jean Middle School, 3400 Mac Donald Avenue; citizens will learn and be able to ask questions regarding their options when MCE rolls out its program.

Sam Casas encouraged the City Council to establish an ethics commission and also to demand a detailed budget to restore public trust.

Bishop Andre Jackson invited everyone to a public meeting with Senator Loni Hancock, Friday, April 5, 2013; 1:30 to 3:30 p.m. in the Richmond Council Chambers, regarding the findings of the Chevron fire.

Marilyn Langlois stated that according the investigative report summary released there has been a violation of public trust by Human Resources Director and Assistance City Manager Leslie Knight; a top leader that should be a role-model to all employees and should be held accountable. Ms. Langlois stated that since the information that was shared indicated a misuse of public funds, the pubic wants and needs to know what would be done about it. Ms. Langlois also stated that she supports the residents and city employees that are calling for honesty, integrity, and fairness.

Juan Reardon stated that Richmond residents pay taxes to pay salaries of city staff, and it was essential that residents could trust the people spending the money. Mr. Reardon stated that those that manage others should be held to the highest standards of accountability. Mr. Reardon also reminded everyone that when Mayor McLaughlin learned that an individual in her office was embezzling funds, she immediately

encouraged the Mr. Lindsay to following the example of Mayor McLaughlin and immediately stop tolerating fraud and remove those committing it.

Texanita Bluitt thanked the City Council for holding the joint meeting with the West Contra Costa County School Board and promoting renovations to the Kennedy Swim Center and schools throughout the City of Richmond. Ms. Bluitt stated that the community needs to work together to improve the quality of education for our children.

Rodney Ferguson stated that justice delayed was justice denied and that it was time for the City Council do the right thing. He encouraged the City Council to be an example to all people that were trying to get their lives together and if the City Council could not make the hard decisions, then it would be difficult for others to make the hard decisions.

Charles Smith started his address to the City Council by quoting from a speech by President Obama that stated "everyone plays by the same set of rules." Ms. Smith stated that everyone playing by the same rules was one of the most cherished values. Mr. Smith stated that he would suggest that if Mr. Lindsay does not believe that Human Resources Director and Assistant City Manager Leslie Knight has committed crimes that merit the termination of her contract, then he was ethnically challenged.

Mike Parker thanked Stacie Plummer for the courage to demand that the City live up to the standards of integrity that citizens want. He also stated that a city only works when the citizens have trust in city government and that public trust in the City of Richmond leadership must be restored. Mr. Parker also stated that the City of Richmond must find a way to make it clear that there would be zero tolerance for any managers of the City of Richmond who believes that they are above the rules.

## REPORT FROM THE CITY ATTORNEY OF FINAL DECISIONS MADE AND NON-CONFIDENTIAL DISCUSSIONS HELD DURING CLOSED SESSION

City Attorney Bruce Reed Goodmiller stated that there were no reportable actions.

## CITY COUNCIL CONSENT CALENDAR

On motion of Councilmember Rogers, seconded by Councilmember Beckles all items marked with an (*) were approved by the unanimous vote of the

amount of $6,000, and approve an amendment to the
Fiscal Year 2012/13 operating budget, increasing
library fund revenue and expenditures in the amount of
$6,000, allowing these LSTA funds to be used to
purchase literacy materials for the Literacy for Every
Adult Program (LEAP).

        *-Approved a contract with CPS HR Consulting
to develop and administer promotional examinations for
Fire Captain, Fire Engineer, and Fire Inspector I in an
amount not to exceed $55,000 and for a term of April 3,
2013, to June 30, 2015.

        *-Adopted **Resolution No. 25-13** amending the
City of Richmond's Position Classification Plan to add
the new classification of Duplicating/Mail Specialist I/II
and delete the classifications of Duplicating/Mail
Assistant and Senior Duplicating/Mail Assistant.

        The matter to introduce an ordinance for first
reading establishing the wages, salary, and
compensation for the new classification of
Duplicating/Mail Specialist I (Salary Range No. 12:
$3,403 - $4,137/month) and, the new classification of
Duplicating/ Mail Specialist II (Salary Range No. 18:
$3,743 - $4,551/month) was presented by City Manager
Bill Lindsay. Diane Canepa gave comments. **The
matter was continued to April 16, 2013, to gather
more information.**

        The matter to approve an amendment to the
contract with Strongbuilt Construction Company for
building repair work performed at 1350 Kelsey Street in
the amount of $5,912.77, increasing the total cost of the
project to $12,792.77, and extending the term through
March 31, 2013, was presented by Project Manager
Craig Murray. On motion of Vice Mayor Booze,
seconded by Councilmember Myrick approved an
amendment to the contract with Strongbuilt
Construction Company by the following vote: **Ayes:**
Councilmembers Bates, Butt, Myrick, Rogers, Vice
Mayor Booze, and Mayor McLaughlin. **Noes:** None.
**Abstentions:** None. **Absent:** Councilmember
Beckles.

        *-Approved an amendment to the lease of
property located at 500 23rd Street (RichmondBUILD
III), extending the term for the six-months ending June
30, 2013, at a cost of $5,000 per month, for a total lease
payment of $30,000.

        *-Approved an amendment to the contract with
The Glen Price Group to develop the Richmond
Workforce Investment Board Strategic Plan for 2013-
2017 and various grant applications by the agreed upon

The matter to approve a one-year contract with Regina Almaguer, LLC for services as project manager of the Port of Richmond Public Art Project in an amount not to exceed $33,750 was presented by Arts Director Michele Seville. Angel Perez, Bruce Beyaert, Tom Leatherman, and Fletcher Oakes gave comments. A motion was made by Councilmember Bates, seconded by Councilmember Beckles to approve a one-year contract with Regina Almaguer, LLC for services as project manager of the Port of Richmond Public Art Project. A substitute motion was made by Councilmember Butt to direct the Port Department to contribute the entire cost of $600,000 and contribute $225,000 to the Arts Advisory Committee and another $225,000 to finish the Bay Trail Project failed for lack of a second. The original motion passed by the following vote: **Ayes:** Councilmembers Bates, Beckles, Rogers, Vice Mayor Booze, and Mayor McLaughlin. **Noes:** Councilmember Butt. **Abstentions:** Councilmember Myrick. **Absent:** None.

The matter to approve the following reappointments to: Commission on Aging: Myrtle Braxton, incumbent, term expiring May 19, 2015; Delores Johnson, incumbent, term expiring May 19, 2015; Beverly Wallace, incumbent, term expiring May 19, 2014; Eli Williams, incumbent, term expiring May 19, 2014; Human Relations and Human Rights Commission: Betty Burrus-Wright, incumbent, term expiring March 30, 2016; Point Molate Citizen Advisory Committee: Charles Smith, incumbent, term expiring May 3, 2015; Recreation and Parks Commission: Pam Saucer-Bilbo, incumbent, term expiring October 26, 2015; Economic Development Commission: Qiana Riley, incumbent, term expiring March 30, 2016, was pulled for public comments by Jackie Thompson. Following public comment on motion of Vice Mayor Booze, seconded by Councilmember Bates approved the reappointments by the unanimous vote of the City Council.

\*-Adopted **Ordinance No. 4-13** establishing the wages, salary, and compensation for the new classification of Source Control Superintendent (Salary Range No. 064D: $7,277 - $8,829/month).

The matter to approve an Advisory Services Agreement with Mortgage Resolution Partners, LLC to assist the City of Richmond in reducing the impact of the mortgage crisis, by advising on the acquisition of mortgage loans through the use of eminent domain, in order to restructure or refinance the loans and thereby preserving home ownership, restoring homeowner equity and stabilizing the communities' housing market and economy by allowing many homeowners to remain

*Butt left the meeting at 9:15 p.m.* Leland Chan and
Melvin Willis gave comments. A motion was made by
Councilmember Beckles, seconded by Councilmember
Myrick to approve an Advisory Services Agreement
with Mortgage Resolution Partners, LLC.
Councilmember Myrick requested a report back from
staff regarding loan criteria and specifics. A substitute
motion was made by Vice Mayor Booze, seconded by
Councilmember Bates to hold the item over for 30 days
to gather more information. Following discussion,
Councilmember Bates withdrew his second. The
original motion to approve an Advisory Services
Agreement with Mortgage Resolution Partners, LLC
passed by the following vote: **Ayes:** Councilmembers
Bates, Beckles, Myrick, Rogers, Vice Mayor Booze,
and Mayor McLaughlin. **Noes:** None. **Abstentions:**
None. **Absent:** Councilmember Butt.

## RESOLUTIONS

**Withdrew from the agenda** the matter to adopt
a resolution calling for restoration of public trust
through the removal of an executive City employee
from current position.

The matter to adopt a resolution in support of
AB 218 (Dickinson) to expand the "Ban the Box"
policy to state employment to eliminate the inquiry
about criminal history on any initial employment
application was presented by Councilmember Beckles
and Mayor McLaughlin. Jackie Thompson, Marilyn
Langlois, and Eduardo Martinez gave comments. On
motion of Councilmember Beckles, seconded by
Councilmember Myrick adopted **Resolution No. 26-13**
by the unanimous vote of the City Council.

## COUNCIL AS A WHOLE

The matter to review the proposed Term Sheet
for post-collection services as negotiated between
RecycleMore and Republic Services and authorize an
agreement based on this Term Sheet and review the
proposed solid waste collection services based on the
Term Sheet, and other possible modifications to
collection services, and authorize staff to develop a
proposed agreement with Republic Services regarding
these service modifications for subsequent Council
approval was presented by Sustainability Associate
Jennifer Ly and Rob Hilton, from HF&H Consultants.
A motion was made by Vice Mayor Booze, seconded by
Councilmember Myrick to review the proposed Term
Sheet for post-collection services as negotiated between
RecycleMore and Republic Services and authorize an
agreement based on this Term Sheet and review the
proposed solid waste collection services based on the

to negotiate the best deal for the citizens for Richmond as details are worked out. The friendly amendment was accepted. Councilmember Bates requested that staff prepare an analysis of the benefits of keeping the JPA. The motion including the friendly amendment was approved by the unanimous vote o the City Council.

The matter to discuss and give direction to staff regarding the Code Enforcement Department's use of contractors outside the City of Richmond for Code Enforcement demolitions was presented by Vice Mayor Boozé and Code Enforcement Manager Tim Higarres. This item was referred to the Public Safety Committee, and Vice Mayor Boozé also requested that a staff form a committee in addition to the Public Safety Committee specifically to discuss the issue.

The matter to consider directing the city manager to prepare a plan to publicize and to assist residents to take advantage of programs for free or reduced cost access to the Internet, including seeking out grants was presented by Councilmember Rogers and Mayor McLaughlin. Councilmember Bates suggested that staff outreach to the Richmond Neighborhood Councils to inform citizens. Jackie Thompson and Ken Maxey gave comments. On motion of Councilmember Rogers, seconded by Mayor McLaughlin directed the city manager to prepare a plan to publicize and to assist residents to take advantage of programs for free or reduced cost access to the Internet, including seeking out grants by the unanimous vote of the City Council.

The matter to receive a report from staff on the status of proposed solar powered streetlights along Richmond Parkway was presented Councilmember Beckles. City Manager Bill Lindsay gave an oral report. Councilmember Beckles directed staff to submit a feasibility study of solar powered streetlights. Vice Mayor Booze stated that the installation of lighting on the Richmond Parkway was currently underway. Sims Thompson gave comments.

### REPORTS OF OFFICERS: STANDING COMMITTEE REPORTS, REFERRALS TO STAFF, AND GENERAL REPORTS (INCLUDING AB 1234 REPORTS)

Councilmember Bate announced that Richmond citizen Myrtle Hunt passed and requested that Mayor McLaughlin adjourn the meeting in honor of her memory.

adjourned at 11:31 p.m. in memory of Richmond resident Myrtle Hunt, to meet again on Tuesday, April 16, 2013, at 6:30 p.m.

 

 

 

_____

City Clerk

(SEAL)

Approved:

 

 

_____

Mayor

# Exhibit G

latimes.com/business/money/la-fi-mo-richmond-eminent-domain-20130730,0,7196420.story

# latimes.com

## Richmond adopts eminent domain mortgage plan

By Alejandro Lazo

10:46 AM PDT, July 30, 2013

Richmond is adopting a plan to take over underwater mortgages that would invoke the city's eminent domain powers if necessary.   advertisement

The city will be the first in the nation to formally adopt the novel but controversial plan that was rejected by San Bernardino County and two of its cities earlier this year.

The city said it will buy home mortgages from financial institutions, write down those loans and refinance homeowners in the properties into new loans. If financial institutions do not cooperate, the city will seize the loans using eminent domain, Richmond Mayor Gayle McLaughlin said.

### PHOTOS: SoCal's most affordable ZIP Codes for home buyers

"This is a tool to get the job done," McLaughlin said. "The housing crisis is still ongoing."

The city on Tuesday sent notice to the holders of more than 620 underwater mortgages for homes in the city, asking these servicers and trustees to sell the city these loans. The city sent letters to 32 entities. The city plans further such actions in the future, officials said in a conference call with reporters Tuesday.

Eminent domain is usually used to seize land — not loans — to serve the public good, as when local governments seize blighted properties. The Richmond plan would be the first widespread attempt at using eminent domain to seize residential mortgages.

The city will team up with the San Francisco firm Mortgage Resolution Partners, which last year pitched the plan to San Bernardino and two of its cities, Fontana and Ontario. That county and the two cities formed a Joint Powers Authority to consider the eminent domain idea but then shelved it after Wall Street groups voiced sizable opposition and little public support was heard. The county and the two cities were the first communities to consider the plan.

The Securities Industry and Financial Markets Association of New York has been a hefty opponent of the eminent domain plan, with its managing director appearing before a number of municipal meetings to speak against it. On Tuesday, the group reaffirmed its disapproval in a brief email to The Times.

McLaughlin, the Richmond mayor, said on Tuesday that city officials had spoken to members of the group but remained resolute to move forward despite their opposition.

"We are just not going to back down; we really feel it is the responsibility of the servicers and the banks to fix this, and they haven't, so we are taking this into our own hands," she said. "It is our community that is at stake here."

Mortgage Resolution Partners will provide the funding for Richmond to purchase the loans and also finance any litigation.

**ALSO:**

Southland home prices soar 28.3% in June

Pending home sales fall in June, Realtor group says

San Bernardino abandons eminent domain mortgage plan

Copyright © 2013, Los Angeles Times

# Exhibit H

# Mortgage Resolution
## PARTNERS

FREQUENTLY ASKED QUESTIONS

## TABLE OF CONTENTS

SECTION ONE: LEGAL ................................................................................................ 2

SECTION TWO: FAIRNESS........................................................................................5

SECTION THREE: BUSINESS........................................................... ......................6

SECTION FOUR: ECONOMICS.......................................................................................9

SECTION FIVE: GOVERNMENT........................................................................................10

SECTION SIX: ORGANIZATION/FOUNDERS................................................................. 12

Frequently Asked Questions

## SECTION ONE: LEGAL

**1.  Doesn't eminent domain only apply to real estate?**  No.  The power of eminent domain applies to every kind of property, including real estate (like land), tangible personal property (like goods), and intangible personal property (like loans).

**2.  Can the government condemn property by eminent domain and transfer it to a private person to use to earn a profit?**  Yes, in California and many other states, as long as the government finds that the private use may serve a public interest.  Governments do so all the time, selling condemned property to developers who profit from building offices, shopping malls, or housing.  In fact, in limited cases a government can even authorize private parties to directly exercise eminent domain to acquire property for their business use without any government involvement at all.

**3.  Are borrowers morally and legally obligated to pay the entire balance of their purchase money mortgage?**  No, particularly in California.  Reckless lending standards in the past have caused real estate bubbles and crashes resulting in defaults that have harmed homeowners, destroyed the local economy and overwhelmed the state judicial system.  As a consequence, California has deliberately allocated purchase money mortgage loan risk to the lender by enacting laws that allow a borrower to walk away from a purchase money home loan and effectively limit the lender's remedy to foreclosing on the home.  This is a fundamental public policy in California and a fundamental part of the homeowner's bargain in taking out a purchase money home loan.  Lenders are fully aware of their share of the risk of making a purchase money home loan in California.

**4.  Can the government acquire performing loans, or only defaulted loans?**  As long as it is acting to further a public purpose, a government can acquire any kind of loan including performing, delinquent or defaulted loans.  A government can purchase underwater performing loans to further a number of purposes -- negative equity is the single greatest predictor of future default, and it creates harm even absent default (including reduced homeowner investment in property maintenance and dislocation in the local property sales market because of restrictions on short sales).

**5. What makes you trust the legal advice you have received?**  Mortgage Resolution Partners (MRP) has received the advice of counsel with national or statewide reputations for excellence and expertise in litigation, eminent domain law and constitutional law.  Both clients and other lawyers regularly select the same counsel to handle cases raising eminent domain, constitutional and public policy issues, and we have great confidence in their advice.   Ultimately, each city will rely on its own legal review before proceeding with eminent domain actions.

**6. What rights will the homeowners have when you provide notice?**  Homeowners will have the same rights and the same obligations that they have now under their loan agreements. This program simply changes the owner of their loan, not the terms of the loan.  But more importantly, they will gain an opportunity -- the opportunity to work with a new loan holder that is not bound by the limitations of any securitization contract and lacks the conflicts of interest that current loan servicers have. Also, current plans provide for the homeowners to opt in to the MRP program on a

voluntary basis.

**7.  What rights will the loan owners have?**  The trusts that currently hold the mortgage loans will have the right to receive the fair market value of the loans.  This includes the right to a trial to determine the fair value of the loans if the trusts disagree with our valuation.

**8.  What about second mortgage holders?**  We expect to negotiate directly with holders of second loans, or use eminent domain to acquire those loans, in order to comprehensively deal with the homeowner's total mortgage debt.  If a second loan has significant value because it is full recourse it may be necessary to acquire only the mortgage lien or a lesser interest in the loan.  Unlike existing lenders, we will be able to deal with all loans encumbering a property comprehensively at the fair value of each.

**9.  Why do you need eminent domain?  Why don't you just buy loans in the market?**  Private securitization trusts hold approximately $1.4 trillion of loans; we could offer to buy their underwater loans, but their trust agreements forbid them to voluntarily sell the loans.  Eminent domain allows us to purchase those loans as well as related second mortgage loans if the holders of the seconds are also unable (or unwilling) to sell.  Eminent domain is a way to successfully consolidate ownership of a homeowner's mortgage loans in the hands of someone with the economic incentive and freedom to modify or otherwise resolve the loans.

**10.  How do you plan to address the legal backlash that could occur?**  California has a well defined judicial process for adjudicating eminent domain actions and gives them priority in court. Loan owners (or Servicers on their behalf) might litigate the right to purchase the loans and the amount of compensation due.  We are confident that the communities have the authority to purchase the loans, and we will provide resources to defend against any legal challenge to that right.  We will stand willing to negotiate over price with the goal of reaching agreement on fair value.  Absent agreement, there will be a final jury determination of fair value in the condemnation action.

**11.  Isn't there a legal step where judges must agree to the eminent domain plea?  What if they don't?**  As long as the community has the authority, as confirmed by the court, to purchase the loan and pays fair value, the court must permit the acquisition.  There is a process under which the community may request the court's permission to purchase the loan first and finally determine fair value later (a "quick take").  We expect that the quick take will be a necessary component of the plan.

**12.  Who really owns the loans?**  Securitization trusts typically hold the first mortgage loans that will be purchased by eminent domain.  A variety of investors including hedge funds and mutual funds own interests in the trusts and thus the ultimate right to payments for the loans. Third party banks service the loans, and third party trustees monitor the servicers.  Banks typically hold for their own account the second mortgage loans.

**13.  Who goes to court?**  Assuming the purchase requires court action, the communities will go to court, as will the securitization trust and holder of the second mortgage loan.

**14. What happens if they question your valuation of the loan?** The trust or bank may seek a higher valuation in the legal proceeding. They and we will provide evidence of value; initially the judge, and ultimately the jury, will determine fair value.

**15. How will you deal with missing notes, incomplete records in MERS, and similar mistakes that create havoc in the foreclosure process?** Many loan originators and servicers lost important documents or failed to record transfers in their haste to securitize and re-securitize loans. Borrowers rarely deny that they owe their debts; they just need to be sure that they pay the right person, and courts need to be sure that anyone who tries to foreclose actually has the right to do so. Eminent domain resolves these issues. It transfers complete ownership of the loan to the city, regardless of missing paperwork. Anyone who claims to own the loan can prove it in the action and receive the proceeds. Eminent domain settles once and for all who owns the loan (the city) and who has the right to receive payment. Clearing up the paperwork disaster is not a purpose of our program, but it is a fortunate side benefit.

## SECTION TWO: FAIRNESS

**1. Is your program a giveaway to the undeserving who borrowed more than they should have to purchase houses they never should have owned?** No. Everyone in California has the opportunity to purchase a home by borrowing from a lender who is willing to take a loss if home prices decline by more than the homeowner's down payment (see Legal FAQ 3 above). The lender willingly takes the risk when making the loan, and the fair market value of the loan reflects that risk. By purchasing the loan at fair value, we give the lender the benefit of its bargain. By doing an economically rational modification or other resolution with the homeowner, we respect the homeowner's benefit of his or her bargain.

**2. Regardless of the legal niceties, is it just wrong and a moral hazard to let these homeowners stay in their homes?** No. We protect our neighbors' homes, even allowing them to keep the equity in their homes while canceling their debts in bankruptcy, because it is the right thing for them and the right thing for us. We do not put our neighbors into debtor's prison, or make them homeless unnecessarily. America is facing an economic crisis and the solution requires practical action that keeps people in their homes. We are all in this together, for our neighborhoods, our states and our nation. The real moral hazard is that the system is forcing homeowners to default in order to achieve rational solutions.

**3. Won't those who don't qualify think this is unfair?** As with many societal issues that have challenged us in the past, solutions do not always provide a direct benefit to everyone. In this case, success will benefit even those who do not qualify by stabilizing home values, restoring neighborhoods and promoting the local economy. Together with the state and the participating communities we will actively address public concerns and educate the public on the benefits to all of stemming the default crisis.

## SECTION THREE: BUSINESS

**1. What is the fair market value of a loan, and how will you determine it?** Fair market value is the price that a willing buyer would pay a willing seller, neither under any compulsion to transact. Similar sales of troubled loans in the secondary market exist and are good evidence of fair value. These sales occur at a significant discount to the fair value of the home because of the foreclosure discount -- the market's recognition of the cost in time, money and effort to foreclose on the homeowner and thereafter to maintain and sell the property. We will use these market data points and supplemental methods including discounted cash flow modeling.

**2. How will MRP make money?** MRP will partner with communities to purchase all loans (or interests in seconds) encumbering a property through eminent domain at fair value, which will be significantly less than the fair value of the home. We will then proactively work with borrowers to modify or refinance the loans, or possibly take other action (such as a deed in lieu of foreclosure and rent-back or a short sale). Current plans provide for MRP to charge a simple, fair, and transparent flat fee (paid for by investors) for its services.

**3. Why hasn't anyone else tried this, or have they?** Governments have used eminent domain in the past to address housing dislocations. For example, Hawaii used a statewide program of eminent domain to purchase homes from landlords to sell to tenants when concentrated land ownership had made it difficult for people to buy their own homes. Some have advocated using eminent domain to purchase mortgage loans in the current crisis, including people in the home building, government and academic communities. MRP has simply taken up the idea and run with it because we believe that it is a positive solution to this crisis, particularly for securitized mortgage loans.

**4. What other solutions are being offered? Are they working? What makes this proposal any better?** There are a number of government programs designed to encourage loan modifications. However, these apparently do not provide sufficient incentives for securitized loan servicers who bear the cost and the risk of modifying a loan, with the trust investors reaping the benefits of a successful modification. Moreover, the existing programs do not adequately deal with conflicts of interest among servicers, securitization trust investors, and second mortgage holders. As a result, few modifications have occurred, and most have been unsuccessful, particularly for securitized loans. Our proposal is better because we will cause the purchase of all loans encumbering a home, with the freedom to effect any modification, including write-downs.

**5. How does this affect the borrower's credit?** The effect on a borrower's credit will depend upon the resolution of the mortgage loan that he or she agrees to. We expect that the effect will be no worse than it would be without eminent domain and will be better for the borrower if MRP is able to affect a refinancing or a modification that the existing servicer would not have permitted.

**6. How will this help home values, or will it?** We expect that the program will stabilize home prices by reducing defaults and the resulting forced sales of homes and by reducing the overhang of future expected foreclosures.

**7. Do you really believe this is going to work?** Yes, so much so that we have personally risked our time, our money and our reputations to get this program up and running.

**8. Why California?** California has one of the highest percentages of at-risk loans and the highest dollar amount of at-risk loans of any state. It is a natural and efficient first state for the program. We expect to expand the program to other states once it is up and running.

**9. How will you choose the mortgages?** We will partner with committed local governments that have a sufficient volume of at-risk loans to allow us to make significant investments and make a meaningful difference to the community. The local government offices will help to identify which areas we assist, and each potential mortgage will then go through the regular underwriting and eligibility process.

**10. What are your plans after the California pilot? Other cities? Other states?** We plan to expand beyond the pilot, both in California and in other states. There is much opportunity both in-state and out-of-state to build on the program's potential value.

**11. How many borrowers have second mortgages (like HELOCs), and how will you handle them?** We expect that a significant percentage of borrowers will have second mortgages. We expect to reduce or eliminate the balance of the homeowner's second mortgage loan at the same time as the first, either in a voluntary transaction with the holder of the second or (if necessary) by purchasing it through eminent domain.

**12. What reactions do you expect from the major bank servicers?** We expect the servicers to initially oppose the program. However, we hope that they will come to recognize that the program is the best way to resolve the troubled loans in the securitization trusts for the benefit of all parties involved in the trust, including the trust investors, the trustee, and the servicer.

**13. Who will underwrite the new loans -- MRP, third parties, or both?** Both. MRP will determine the underwriting criteria for selecting loans based on the requirements of third party lenders, Fannie Mae, Freddie Mac, the FHA, and other parties who will ultimately acquire, refinance or guarantee the loans. We expect to work with third party mortgage professionals in each participating community to underwrite the new loans. This will bring local expertise to the underwriting process and support to the local economy.

**14. Won't you have to lend to unqualified borrowers in order to keep people in their homes? How will you manage credit risk?** We will not refinance or modify loans for borrowers who do not qualify. We will manage credit risk through underwriting to the requirements of third party lenders and guarantors, who will provide the ultimate take-out for the loans. We may offer other resolutions for homeowners who no longer qualify for loans, such as expedited consideration of proposed short sales and accepting a deed in lieu of foreclosure and potentially renting the home back to them (via an appropriate partner). In addition, a portion of the returns will be dedicated to communities, which may use the funds to finance community housing or other needs.

**15. How will you deal with competition from the major banks once you announce your program?** We believe that city and state governments may be unwilling to work with major banks or other potential competitors because of their or their affiliates' roles in creating or prolonging the mortgage crisis. Other companies could in time create similar mortgage resolution businesses. However, the inventory of distressed mortgage loans is unfortunately so great and so widespread that there is room and need for other companies to operate in the space without adversely affecting our business model.

**16. Will you partner with existing lenders? Why or why not?** We expect to work with selected existing lenders as well as independent real estate professionals to refinance the homeowner's loans.

**17. What criteria will you use to select loans to acquire?** We will work with each government agency to determine the criteria that best meet the community's needs – with the goal of keeping homeowners in their homes. We expect initially to acquire loans that are significantly underwater, but which are current (not in default). Subsequently, we may expand the program to acquire loans that are in default, but where the homeowner can afford a refinanced loan with a reduced principal amount.

**18. If you are successful in modifying loans and reducing principal, won't the homeowner be taxed on the reduction?** Through 2012, both federal and California laws forgive the tax for debt used to purchase or improve the home. If the borrower used the proceeds for other purposes, like buying a boat, then the reduction may be taxable. Even after 2012, debt forgiveness generally may not be taxable to the extent the borrower's total debt exceeded total assets, which we expect will be the case for many homeowner participants. The program will be voluntary for homeowners, so they will determine whether to participate based on their own circumstances, including their own tax position. MRP will not provide tax advice, and will urge potential participants to seek such advice.

**19. How long will this take?** We expect a period of 4 to 12 months from the beginning of the borrowers' opt-in period until completion of loan refinancing.

**20. We've seen what outsourcing did to loan modification programs with the big banks. If you are going to outsource, how can you ensure quality?** Many of the problems with outsourcing have come from conflicts of interest that the large bank servicers have. They bear the high costs of servicing troubled loans and negotiating modifications, but they do not get the benefits of a successful modification. This has led them to outsource to firms that will foreclose as quickly and cheaply as possible. We intend that our program's investors will acquire all of a homeowner's mortgage loans and bear the risk and returns of restructuring the loans, so our program will not have this conflict of interest. We will closely monitor all service providers because it is in our interest for them to do their jobs right.

## SECTION FOUR: ECONOMICS

**1. How can the loan purchasers earn a profit if they pay fair value for a loan – and won't the trusts have a free look back to demand more compensation in court?** MRP and the loan purchasers can pay fair value and still earn a profit because they will take the risks and earn the returns of acquiring underwater loans and then refinancing them. Many investment funds purchase distressed whole loans from bank portfolios in consensual transactions and then profit by working them out; we expect our loan purchasers to pay the same price that they do. We will seek to provide appropriate reserves for look back risk based on the court's ultimate determination.

**2. How will MRP make money?** MRP intends to earn fees that are simple and transparent based in part on its success in obtaining control over and modifying or otherwise resolving the loans.

**3. Will you share profits with the communities?** We expect to contribute to the communities (or not-for-profit organizations) a fixed amount per loan acquired, which may support community housing needs.

**4. How have you structured this to create the various profit margins you will need? Who pays for the legal fees?** The structure of the loan acquisitions and the expected loan resolutions will create the necessary profit margins to pay for program costs, including funding costs and legal fees.

## SECTION FIVE: GOVERNMENT

**1. Eminent domain is already so controversial. Are you concerned about how this will be perceived?** Eminent domain is controversial when it displaces homeowners to help unrelated investors. The program will use eminent domain to help homeowners, and we expect it to show that local governments are part of the solution, not part of the problem.

**2. What about the bigger picture? Isn't this going one step further to disempower private businesses and empower the government?** No. Eminent domain is an inherent power of American governments, one that they have used throughout our nation's history. It is such a fundamental part of government that the US Constitution expressly permits it, as long as the government has a public purpose and pays fair value for the property. Moreover, the government entities will not enter the mortgage loan business or displace any mortgage companies.

**3. Is there an ulterior political motive here?** No. Eminent domain is a governmental action to achieve governmental objectives, and the objectives are clear -- to reduce the harm that the residential home loan crisis is causing our communities, to stabilize neighborhoods, and to support local economic activity.

**4. I read something in the WSJ about a program that President Obama was considering. Is this it?** No. Our program is a local one controlled by local city and county governments, supported by private investment funds.

**5. How will this affect property taxes?** By resolving underwater loans more efficiently with fewer foreclosure sales, we expect the program to stabilize the property tax base and to help collect delinquent property taxes.

**6. If this is such a good solution, why didn't the government do this instead of the bank bailouts?** Our program addresses a different problem and offers a different solution. The federal government acted to prevent a national financial collapse; that problem required a national solution at a scale that only the federal government could provide. The residential mortgage loan crisis affects individual communities differently and requires a local solution. We can implement the solution on a local scale, funded with private capital.

**7. Will participating cities be blackballed?** We regard it as unlikely that lending institutions would "redline" or "blackball" a city for exercising a sovereign right. Banks are in the business of making interest margin, and we believe that they will seek to do so wherever the opportunity arises. Punishing communities is not good for business. Also, there are legal strictures that may prevent such retaliation (such as the Community Reinvestment Act).

**8. How have you planned to budget for all of the legal costs that will come out of this? Especially for the participating municipalities, how will you put their fears at rest regarding this?** We have budgeted for extensive legal fees. MRP's financial model provides that

**SECTION FIVE: GOVERNMENT**

**1. Eminent domain is already so controversial. Are you concerned about how this will be perceived?** Eminent domain is controversial when it displaces homeowners to help unrelated investors. The program will use eminent domain to help homeowners, and we expect it to show that local governments are part of the solution, not part of the problem.

**2. What about the bigger picture? Isn't this going one step further to disempower private businesses and empower the government?** No. Eminent domain is an inherent power of American governments, one that they have used throughout our nation's history. It is such a fundamental part of government that the US Constitution expressly permits it, as long as the government has a public purpose and pays fair value for the property. Moreover, the government entities will not enter the mortgage loan business or displace any mortgage companies.

**3. Is there an ulterior political motive here?** No. Eminent domain is a governmental action to achieve governmental objectives, and the objectives are clear -- to reduce the harm that the residential home loan crisis is causing our communities, to stabilize neighborhoods, and to support local economic activity.

**4. I read something in the WSJ about a program that President Obama was considering. Is this it?** No. Our program is a local one controlled by local city and county governments, supported by private investment funds.

**5. How will this affect property taxes?** By resolving underwater loans more efficiently with fewer foreclosure sales, we expect the program to stabilize the property tax base and to help collect delinquent property taxes.

**6. If this is such a good solution, why didn't the government do this instead of the bank bailouts?** Our program addresses a different problem and offers a different solution. The federal government acted to prevent a national financial collapse; that problem required a national solution at a scale that only the federal government could provide. The residential mortgage loan crisis affects individual communities differently and requires a local solution. We can implement the solution on a local scale, funded with private capital.

**7. Will participating cities be blackballed?** We regard it as unlikely that lending institutions would "redline" or "blackball" a city for exercising a sovereign right. Banks are in the business of making interest margin, and we believe that they will seek to do so wherever the opportunity arises. Punishing communities is not good for business. Also, there are legal strictures that may prevent such retaliation (such as the Community Reinvestment Act).

**8. How have you planned to budget for all of the legal costs that will come out of this? Especially for the participating municipalities, how will you put their fears at rest regarding this?** We have budgeted for extensive legal fees. MRP's financial model provides that

funding sources and the margins from the loan acquisitions and refinancings will directly pay all legal costs of condemnation and valuation actions.

**9. What liability do the participating municipalities have?** The participating governments or joint powers authorities will be liable to pay the fair value of the loans as well as certain legal costs and fees. MRP and its funding sources will pay for these costs as described in the answer to FAQ 8.

### SECTION SIX: ORGANIZATION/FOUNDERS

**1. Who is MRP?**  MRP is the manager of this resolution program.  It will obtain the funding to pay for the acquired loans, and it will manage the process of resolving the loans.

**2. Where will your corporate offices and operations be based?**  MRP's offices and operations are based in San Francisco.  As we implement the program we will work with the independent real estate service community in each participating community, which should contribute to the local economy.  MRP may open additional offices in other cities and states as the program expands.

**3.  Who is Gordian Sword and what role does it play?**  Gordian Sword is the company that the program's founders set up to help create the program and to manage Mortgage Resolution Partners.

**4. Why LLCs?**  Limited liability companies are a typical form of organization for investment and investment management businesses.  They operate with the flexibility of partnerships while providing all investors with limited liability like shareholders in a corporation.