MAYER BROWN LLP
DONALD M. FALK (SBN 150256)
*dfalk@mayerbrown.com*
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: 650-331-2000
Fax: 650-331-2060

MAYER BROWN LLP
BRONWYN F. POLLOCK (SBN 210912)
*bpollock@mayerbrown.com*
350 S. Grand Ave., 25th Floor
Los Angeles, CA 90071-1503
Tel: 213-229-9500
Fax: 213-625-0248

Attorneys for Plaintiffs
THE BANK OF NEW YORK MELLON and THE
BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustees

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BANK OF NEW YORK MELLON (f/k/a The Bank of New York), as Trustee, on behalf of the Trusts listed in Exhibit A; and U.S. BANK NATIONAL ASSOCIATION, as Trustee, on behalf of the Trusts listed in Exhibit B, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF RICHMOND, CALIFORNIA, a municipality; RICHMOND CITY COUNCIL; MORTGAGE RESOLUTION PARTNERS L.L.C., a Delaware limited liability company; and GORDIAN SWORD LLC, a Delaware limited liability company <br><br> Defendant. | Case No.: 13-cv-3664-JCS <br><br> **STIPULATION FOR FILING OF SECOND AMENDED COMPLAINT** |

1  WHEREAS, on August 7, 2013, The Bank of New York Mellon (f/k/a The Bank of
2  New York), as trustee, initiated this action against Defendants (the "Action");

3  WHEREAS, on August 9, 2013, The Bank of New York Mellon filed the First
4  Amended Complaint, which added an additional trustee as plaintiff, U.S. Bank National
5  Association;

6  WHEREAS, The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of
7  New York Trust Company, N.A.), Wilmington Trust Company, and Wilmington Trust,
8  National Association, as trustees, seek relief against Defendants arising out of the same series
9  of occurrences;

10  IT IS HEREBY STIPULATED by and between the Parties hereto through their
11  respective attorneys that Plaintiffs may file a Second Amended Complaint, a copy of which is
12  attached hereto as Exhibit C.  The Second Amended Complaint adds The Bank of New York
13  Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.),
14  Wilmington Trust Company, and Wilmington Trust, National Association, as trustees, as
15  Plaintiffs, and contains other minor revisions.

16  IT IS FURTHER STIPULATED that the Second Amended Complaint is deemed filed
17  on the date of entry of Court's order pursuant to this stipulation.

18

19  **SO STIPULATED.**

20  Dated: August 22, 2013

MAYER BROWN LLP
DONALD M. FALK
BRONWYN F. POLLOCK

21

22  By: */s/ Bronwyn F. Pollock*
Bronwyn F. Pollock
23  Attorneys for Plaintiffs
THE BANK OF NEW YORK MELLON
24  (f/k/a The Bank of New York) and THE BANK
OF NEW YORK MELLON TRUST
25  COMPANY, N.A. (f/k/a The Bank of New York
Trust Company, N.A.), as Trustees
26

27

28

1   Dated: August 22, 2013

2

3

4

5

6

7

8

9

10

11

12

13

14

15   Dated: August 22, 2013

16

17

18

19

20

21

22

23

24   Dated: August 22, 2013

25

26

27

28

JONES DAY
BRIAN D. HERSHMAN (SBN 168175)
*bhershman@jonesday.com*
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Tel: 213-489-3939
Fax: 213-243-2539

JONES DAY
MATTHEW A. MARTEL
(*pro hac vice*)
*mmartel@jonesday.com*
JOSEPH B. SCONYERS
(*pro hac vice*)
*jsconyers@jonesday.com*
100 High Street, 21st Floor
Boston, MA 02110
Telephone: 617-960-3939
Facsimile: 617-449-6999

By: */s/ Brian D. Hershman*
      Brian D. Hershman
Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION,
as Trustee

ALSTON & BIRD LLP
KURT OSENBAUGH (SBN 106132)
*kurt.osenbaugh@alston.com*
WHITNEY CHELGREN (SBN 285362)
*whitney.chelgren@alston.com*
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071
Telephone:    213-576-1000
Facsimile:    213-576-1100

By: */s/ Kurt Osenbaugh*
      Kurt Osenbaugh
Attorneys for Plaintiff
WILMINGTON TRUST COMPANY and
WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Trustees

ALTSHULER BERSON LLP
SCOTT A. KRONLAND (SBN 171693)
*skronland@altshulerberson.com*
177 Post Street, Suite 300
San Francisco, CA 94108

2

By: _/s/ Scott A. Kronland_
    Scott A. Kronland
Attorneys for Plaintiff
CITY OF RICHMOND, RICHMOND CITY
COUNCIL, MORTGAGE RESOLUTIONS
PARTNERS L.L.C. and GORDIAN SWORD
LLC

**SIGNATURE ATTESTATION**

I, Bronwyn F. Pollock, attest that the concurrence in the filing of this Second Amended

Complaint has been obtained from Brian D. Hershman, Kurt Osenbaugh, and Scott A. Kronland.

By: */s/ Bronwyn F. Pollock*
  Bronwyn F. Pollock
Attorneys for Plaintiff
THE BANK OF NEW YORK MELLON
(f/k/a The Bank of New York) and THE BANK OF
NEW YORK MELLON TRUST COMPANY, N.A.
(f/k/a The Bank of New York Trust Company, N.A.),
as Trustees

# Exhibit A

**Trusts For Which The Bank of New York Mellon, f/k/a The Bank of New York, is Trustee**:

| 1 | CHASE 2006-S2 | 29 | CWALT 2006-OA21 | 57 | CWL 2004-BC4 |
|---|---|---|---|---|---|
| 2 | CWALT 2004-14T2 | 30 | CWALT 2006-OC10 | 58 | CWL 2004-ECC1 |
| 3 | CWALT 2004-20T1 | 31 | CWALT 2006-OC8 | 59 | CWL 2005-17 |
| 4 | CWALT 2005-11CB | 32 | CWALT 2007-11T1 | 60 | CWL 2005-3 |
| 5 | CWALT 2005-16 | 33 | CWALT 2007-16CB | 61 | CWL 2005-4 |
| 6 | CWALT 2005-20CB | 34 | CWALT 2007-17CB | 62 | CWL 2005-AB4 |
| 7 | CWALT 2005-27 | 35 | CWALT 2007-4CB | 63 | CWL 2005-AB5 |
| 8 | CWALT 2005-3CB | 36 | CWALT 2007-8CB | 64 | CWL 2006-13 |
| 9 | CWALT 2005-43 | 37 | CWALT 2007-HY4 | 65 | CWL 2006-14 |
| 10 | CWALT 2005-51 | 38 | CWALT 2007-OH2 | 66 | CWL 2006-16 |
| 11 | CWALT 2005-56 | 39 | CWALT 2007-OH3 | 67 | CWL 2006-18 |
| 12 | CWALT 2005-58 | 40 | CWHL 2004-7 | 68 | CWL 2006-19 |
| 13 | CWALT 2005-62 | 41 | CWHL 2005-31 | 69 | CWL 2006-20 |
| 14 | CWALT 2005-63 | 42 | CWHL 2005-9 | 70 | CWL 2006-22 |
| 15 | CWALT 2005-71 | 43 | CWHL 2006-16 | 71 | CWL 2006-24 |
| 16 | CWALT 2005-76 | 44 | CWHL 2006-19 | 72 | CWL 2006-26 |
| 17 | CWALT 2006-33CB | 45 | CWHL 2006-20 | 73 | CWL 2006-3 |
| 18 | CWALT 2006-39CB | 46 | CWHL 2006-9 | 74 | CWL 2006-BC4 |
| 19 | CWALT 2006-42 | 47 | CWHL 2006-HYB1 | 75 | CWL 2007-13 |
| 20 | CWALT 2006-43CB | 48 | CWHL 2007-11 | 76 | CWL 2007-3 |
| 21 | CWALT 2006-6CB | 49 | CWHL 2007-12 | 77 | CWL 2007-5 |
| 22 | CWALT 2006-HY10 | 50 | CWHL 2007-15 | 78 | CWL 2007-7 |
| 23 | CWALT 2006-HY13 | 51 | CWHL 2007-2 | 79 | CWL 2007-8 |
| 24 | CWALT 2006-OA1 | 52 | CWHL 2007-7 | 80 | CWL 2007-BC3 |
| 25 | CWALT 2006-OA10 | 53 | CWHL 2007-HY6 | 81 | FHAMS 2005-FA9 |
| 26 | CWALT 2006-OA12 | 54 | CWHL 2007-HYB1 | 82 | FHAMS 2006-AA4 |
| 27 | CWALT 2006-OA17 | 55 | CWL 2003-5 | 83 | FHAMS 2006-FA4 |
| 28 | CWALT 2006-OA2 | 56 | CWL 2004-14 | | |

**Trusts For which the Bank of New York Mellon Trust Company, N.A., f/k/a The Bank of New York Trust Company, N.A., is the Trustee**:

| 1 | CHASE 2007-A1 |
|---|---|
| 2 | CHASE 2007-S4 |

# Exhibit B

**Trusts For Which U.S. Bank National Association is Trustee:**

| | | | | | |
|---|---|---|---|---|---|
| 1 | ABSC 2004-HE5 | 41 | CSMC 2007-4 | 81 | MASTR ABS Trust 2004-WMC1 |
| 2 | ABSC 2004-HE10 | 42 | FFMLT 2006-FF2 | 82 | MASTR ABS 2005-HE1 |
| 3 | ABSC 2006-HE5 OOMC | 43 | FFMLT 2006-FF14 | 83 | MASTR ABS 2005-HE2 |
| 4 | ACE 01-HE1 | 44 | GPMF 2006-AR6 | 84 | MASTR 2006-NC2 |
| 5 | AHMIT 2005-4 | 45 | GPMF 2006-AR7 | 85 | MLMI 2005-A9 |
| 6 | Ameriquest 2001-2 | 46 | GPMF 2007-AR1 | 86 | MLMI 2006-SL1 |
| 7 | BAFC 2006-2 | 47 | GSAA 2006-3 | 87 | RALI 2006-QO2 |
| 8 | BAFC 2006-A | 48 | GSAA 2006-12 | 88 | RALI 2006-QS2 |
| 9 | BAFC 2006-D | 49 | GSAA 2007-1 | 89 | RAMP 2005-EFC5 |
| 10 | BAFC 2006-G | 50 | GSAA 2007-3 | 90 | RASC 2006-KS5 |
| 11 | BAFC 2006-J | 51 | GSR 2005-9F | 91 | RASC 2005-KS11 |
| 12 | BAFC 2007-C | 52 | GSR 2005-AR1 | 92 | RFMSI 2005-S5 |
| 13 | BART 2005-5 | 53 | GSR 2005-AR7 | 93 | RFMSI 2006-SA1 |
| 14 | BAYVIEW 2006-C | 54 | GSR 2006-2F | 94 | RFMSI 2007-S8 |
| 15 | BNC 2007-1 | 55 | GSR 2007-1F | 95 | SACO I 2005-WM1 |
| 16 | BNC 2007-2 | 56 | GSR 2007-4F | 96 | SAIL 2005-7 |
| 17 | BSABS 2004-FR1 | 57 | GSR 2007-5F | 97 | SAIL 2006-3 |
| 18 | BSABS 2004-HE1 | 58 | HarborView 2005-1 | 98 | SAIL 2006-BNC3 |
| 19 | BSABS 2004-HE5 | 59 | HarborView 2005-2 | 99 | SARM 2005-9 |
| 20 | BSABS 2006-IM1 | 60 | HarborView 2005-16 | 100 | SARM 2005-19XS |
| 21 | Chevy Chase 2005-C | 61 | HarborView 2006-1 | 101 | SARM 2005-22 |
| 22 | Chevy Chase 2006-2 | 62 | HarborView 2006-4 | 102 | SARM 2005-23 |
| 23 | CMALT 2007-A1 | 63 | JPMAC 2005-OPT1 | 103 | SARM 2007-8 |
| 24 | CMALT 2007-A3 | 64 | JPMAC 2005-OPT2 | 104 | SASCO 2006-BC2 |
| 25 | CMALT 2007-A6 | 65 | JPMAC 2006-CH2 | 105 | SASCO 2006-NC1 |
| 26 | CMLTI 2005-8 | 66 | Luminent 2005-1 | 106 | SASCO 2006-WF2 |
| 27 | CMLTI 2006-AR1 | 67 | LXS 2005-5N | 107 | SASCO 2006-WF3 |
| 28 | CMLTI 2006-HE3 | 68 | LXS 2005-7N | 108 | SASCO 2007-BC3 |
| 29 | CMLTI 2006-WF1 | 69 | LXS 2005-9N | 109 | SASCO 2007-BC4 |
| 30 | CMLTI 2006-WF2 | 70 | LXS 2006-4N | 110 | SASCO 2007-BNC1 |
| 31 | CMLTI 2007-10 | 71 | LXS 2006-16N | 111 | SASCO 2007-WF2 |
| 32 | CMLTI 2007-AR8 | 72 | LXS 2006-GP3 | 112 | TMST 2006-4 |
| 33 | CSFB 2005-4 | 73 | LXS 2007-15N | 113 | TMST 2006-5 |
| 34 | CSFB HEAT 2005-8 | 74 | LXS 2007-16N | 114 | Terwin Mortgage Trust 2004-16SL |
| 35 | CSFB MBS 2002-26 | 75 | LXS 2007-18N | 115 | Terwin Mortgage Trust 2004-18SL |
| 36 | CSFB MBS 2003-AR28 | 76 | LXS 2007-2N | 116 | WFMBS 2006-2 |
| 37 | CSFB MBS 2004-AR7 | 77 | LXS 2007-4N | 117 | WFMBS 2006-AR1 |
| 38 | CSFB MBS 2005-2 | 78 | LXS 2007-7N | 118 | WFMBS 2006-AR2 |
| 39 | CSFBMSC HEAT 2007-2 | 79 | MARM 2007-1 | | |
| 40 | CSMC 2006-1 | 80 | MARM 2007-3 | | |

# EXHIBIT C

MAYER BROWN LLP
DONALD M. FALK (SBN 150256)
*dfalk@mayerbrown.com*
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: 650-331-2000
Fax: 650-331-2060

MAYER BROWN LLP
BRONWYN F. POLLOCK (SBN 210912)
*bpollock@mayerbrown.com*
350 S. Grand Ave., 25th Floor
Los Angeles, CA 90071-1503
Tel:  213-229-9500
Fax: 213-625-0248

Attorneys for Plaintiffs
THE BANK OF NEW YORK MELLON and THE
BANK OF NEW YORK MELLON TRUST
COMPANY, N.A., as Trustees

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BANK OF NEW YORK MELLON (f/k/a The Bank of New York) and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. (f/k/a The Bank of New York Trust Company, N.A.), as Trustees, on behalf of the Trusts listed in Exhibit A; U.S. BANK NATIONAL ASSOCIATION, as Trustee, on behalf of the Trusts listed in Exhibit B; and WILMINGTON TRUST COMPANY and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustees, on behalf of the Trusts listed in Exhibit C<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF RICHMOND, CALIFORNIA, a municipality; RICHMOND CITY COUNCIL; MORTGAGE RESOLUTION PARTNERS L.L.C., a Delaware limited liability company; and GORDIAN SWORD LLC, a Delaware limited liability company;<br>Defendants. | Case No. 3:13-cv-3664-JCS<br><br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs allege as follows based on information and belief:

**<u>INTRODUCTION</u>**

1.      This is a case about the misuse of public power for private benefit.

2.      Following a scheme devised by a mortgage investment firm that stands to profit handsomely from the deal, the City of Richmond (the "City") has made clear that it imminently plans to seize residential mortgages—mortgages that are current on their payments—at deep discounts and then refinance the properties at reduced loan values.  The borrowers would retain their homes with a lower debt load.  The City and the investment firm each would receive certain fees generated by the refinancing transactions, and then the firm and its investors would profit from reselling federally guaranteed loans.  And the trusts and their investors, including pension funds and other institutional investors, who held current, performing loans that had financed the purchase of homes in the City would be left holding the bag, losing tens of millions of dollars in loan principal.

3.      The contemplated use of the eminent domain power in this seizure and refinance scheme violates the constitutions of both the United States and California, along with several California statutes.

4.      Plaintiffs The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, Wilmington Trust Company, and Wilmington Trust, National Association are the Trustees of certain trusts that were created to hold residential mortgage loans (collectively, the "Trusts").  The Trusts subject to this action for which The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, Wilmington Trust Company, and Wilmington Trust, National Association are Trustee are listed respectively in Exhibits A, B and C hereto.  The Trusts' beneficiaries include both municipal and private pension plans, 401(k) plans, mutual funds, and other investors.

5.      Defendants City and Mortgage Resolution Partners L.L.C. ("MRP") have entered into an agreement, pursuant to which they will use the City's eminent domain power to seize performing debt instruments—which are not located in Richmond and are held by out-of-state trusts—at deeply discounted prices.  Defendants would then profit by refinancing and

resecuritizing those loans, while paying fees to MRP and to the City.  MRP's investors—whose funds will be used to acquire the loans—will reap substantial profits.  Defendants' mortgage loan seizure program is referred to herein as the "Seizure Program."

6.     Defendants attempt to justify the Seizure Program as one that will help homeowners and communities in Richmond that are struggling with foreclosures, but the Seizure Program actually targets performing loans and does nothing to help homeowners in foreclosure. These loans, which have survived the recession and housing crisis intact, are the ones for which seizure will be most valuable to MRP's investors but least likely to generate any public benefit. Even if the City did intend to take high-risk loans, the Seizure Program still could not create any public benefit, because the Trusts' servicers already can and do forgive principal where doing so would make the loan more valuable, by reducing the risk of default enough to justify the loss of principal.

7.     The Seizure Program is unlawful and unconstitutional and violates numerous federal, state and local laws, including the City's own Charter.  Nevertheless, in connection with its agreement with MRP, the City intends to employ the Seizure Program and has taken substantial steps in its furtherance.

8.     Defendants have already selected over 230 mortgage loans that they wish to seize from the Trusts.  The City has nominally offered to "purchase" the loans on behalf of MRP.  The offers, however, are not in good faith: Defendants' valuation method is designed to produce values that are far below any reasonable level because they give no value to homeowners' steady payment record.  And MRP has stated publicly that federal law precludes the Trusts from selling the loans through the voluntary purchase proposal offered by Defendants.

9.     The low offers are no accident, nor are they the beginning of a constructive negotiation.  Defendants cannot simply purchase the loans consensually from their owners (*i.e.*, the Trusts), because the Seizure Program does not work if the City actually pays fair value. MRP and its investors do not plan to hold the loans for the long-term and collect principal and interest from borrowers.  The Seizure Program is pure financial engineering.  MRP and its investors, with the critical assistance of City's purported power of eminent domain, intend to

3

take the loans for a fraction of their value and then flip them, reselling them in a new securitization.

10.     Defendants do not plan to do anything to enhance the value of the mortgaged properties, to bear market risk, or to work with borrowers to improve their ability to pay.  In fact, the only modification that they plan is to *write off* much of each loan's balance before acquiring the loans.

11.     The Seizure Program purportedly is intended to assist homeowners at risk of defaulting on their mortgage loans and thereby somehow avoid urban blight.  But the design and implementation of the Seizure Program show that the rationale is a pretext.  The Seizure Program actually is intended to generate significant sums for MRP and its investors, with payments to the City in exchange for the use of its eminent domain powers.  The Seizure Program also generates private benefits for the homeowners who are selected for it.

12.     Many of the Trusts' existing guidelines and practices, implemented by the servicers, of modifying loans is further proof that undercompensation, not modification, is the source of the Seizure Program's profit.  The true value of the loans already reflects the Trusts' ability to enhance their value through modification.  There is no indication that MRP, which describes itself as a "community advisory firm," will be as qualified as experienced servicers.  Indeed, the blanket modifications that Defendants plan are unlikely to increase the price of the loans in a resale.  For example, while it is sometimes possible to increase a loan's value with a carefully considered modification, it rarely makes sense to reduce the loan balance when the borrower is making the existing, agreed payments.  Nor is it often the case that a loan will be more valuable if its principal is reduced below the value of the house.  That MRP expects to profit nonetheless demonstrates that undercompensation of the Trusts is an essential element of the Seizure Program.

13.     There are numerous reasons that this scheme is unconstitutional.  As outlined above, the Seizure Program cannot be successful on its own terms if the Trusts receive fair market value.  Thus, this case is more than a dispute about valuation of individual loans.  The takings also are manifestly not for public use—indeed, the Seizure Program specifically carves

1   out loans whose modification might avoid foreclosure, in apparent recognition that many Trusts

2   already can conduct such modifications.  Further, the Seizure Program involves the taking of

3   loans that are located outside of the City's limits and therefore are beyond its eminent domain

4   power.

5       14.   The Seizure Program violates other provisions of the U.S. and California

6   Constitutions as well.  By coercing transactions across state lines and threatening massive

7   disruption to the national mortgage lending and securitization markets, it conflicts with federal

8   power under the Commerce Clause.  It also runs afoul of the Contracts Clause, which bars States

9   and their political subdivisions like the City from modifying private contracts.  In fact, the

10  Seizure Program is a paradigmatic example of the types of misconduct that each Clause was

11  intended to prevent.  The City seeks to abrogate debts that its citizens owe to out-of-town entities

12  and permit a local speculator to reap the profits.

13      15.   Already, the federal government has expressed its concerns about the

14  unconstitutional nature of the Seizure Program and the federal interest in avoiding havoc to

15  mortgage lending nationwide.  In a public statement dated August 9, 2012, the Federal Housing

16  Finance Administration ("FHFA"), the conservator of Fannie Mae and Freddie Mac (the two

17  Government–Sponsored Enterprises ("GSEs") that are among the largest investors in residential-

18  mortgage backed securitization ("RMBS") trusts), stated that "FHFA has significant concerns

19  about the use of eminent domain to revise existing financial contracts" and that "resulting losses

20  from such a program would represent a cost ultimately borne by taxpayers" and would have "a

21  chilling effect on the extension of credit to borrowers seeking to become homeowners and on

22  investors that support the housing market."  77 Fed. Reg. 47,652 (August 9, 2012).  FHFA noted

23  that "[a]mong questions raised regarding the proposed use of eminent domain are the

24  constitutionality of such use," "the effects on holders of existing securities," "the impact on

25  millions of negotiated and performing mortgage contracts," and "critical issues surrounding the

26  valuation by local governments of complex contractual arrangements that are traded in national

27  and international markets."  *Id.*

28

16.     As stated, the targeted loans are out-of-Richmond interests, held by out-of-Richmond entities.  Nevertheless, as an alternative, and to the extent that loans targeted by the Seizure Program may be considered local interests (they are not), the Seizure Program also violates the California Constitution, which, as amended by voter proposition in 2008, expressly prohibits local governments from using eminent domain to seize owner-occupied residences for the purpose of conveying it to a private person.  Cal. Const. art. I, § 19(b).  Specifically, as an alternative basis, the Seizure Program is unlawful if the targeted mortgage loans constitute interests in real property that are secured exclusively by owner-occupied residences and are conveyed to private persons.

17.     Injunctive and declaratory relief is necessary to avoid imminent and irreversible harm, not only to the Trusts but to the national economy.  The City intends to use California's "quick take" procedure, which allows it to condemn property first and ask the courts to determine fair compensation second.  Once each loan is taken, MRP will destroy it through refinancing; a new loan would then be imposed on each borrower, and those new loans would be hastily sold to other investors.  If the Seizure Program is found unconstitutional afterwards, that egg may prove impossible to unscramble, and certainly not without harming innocent homeowners and investors.  Moreover, because of the design of the Seizure Program, the compensable losses to the Trusts will be far greater than the City realizes and may exceed its ability to pay.  MRP is indemnifying the City for these costs, but its financial resources are unknown.

18.     Moreover, several other municipalities—including North Las Vegas, Nevada; El Monte, California; La Puente, California; Orange Cove, California; Pomona, California; and San Joaquin, California—have entered into agreements with MRP.  Litigating each taking individually in state court while waiting for definitive guidance on federal constitutional issues would be wasteful and protracted and lead to years of uncertainty.

19.     The Seizure Program is a scheme that should be nipped in the bud.  That is why Plaintiffs seek immediate relief from this Court.

# THE PARTIES

## A.    Plaintiffs

20.    Plaintiff The Bank of New York Mellon (f/k/a The Bank of New York) is a bank organized under the laws of the State of New York and having its principal place of business at One Wall Street, New York, New York 10286.  The Bank of New York Mellon serves as Trustee for Trusts listed on Exhibit A hereto that hold mortgage loans targeted by the Seizure Program.

21.    Plaintiff The Bank of New York Mellon Trust Company, N.A. (f/k/a The Bank of New York Trust Company, N.A.) is a national banking association formed under the laws of the United States of America and having its principle place of business at 400 South Hope St., Ste. 400, Los Angeles, California 90071 (together with The Bank of New York Mellon, "BNY Mellon Trustees").  The Bank of New York Mellon Trust Company serves as Trustee for Trusts listed on Exhibit A hereto that hold mortgage loans targeted by the Seizure Program.

22.    Plaintiff U.S. Bank National Association is a national bank with its principal place of business at 800 Nicollet Mall, Minneapolis, Minnesota 55402.  U.S. Bank National Association serves as Trustee for Trusts listed on Exhibit B hereto that hold mortgage loans targeted by the Seizure Program.

23.    Plaintiff Wilmington Trust Company is a Delaware trust company with its principal place of business at 1100 North Market Street, Wilmington, Delaware 19890.  Plaintiff Wilmington Trust, National Association is a national banking association with its principal place of business at 1100 North Market Street, Wilmington, Delaware 19890.  Wilmington Trust Company and Wilmington Trust, National Association (collectively, "Wilmington Trust") serve as Trustee for Trusts listed on Exhibit C hereto that hold mortgage loans targeted by the Seizure Program.

24.    The beneficial owners of the Trusts include municipal and private pension plans, 401(k) plans, mutual funds, and other investors.

25.    As the first phase of the Seizure Program, the City sent out letters to approximately 32 trustees and servicers of RMBS trusts offering to purchase approximately 624 loans.  The Mayor of Richmond publicly indicated that this was only the "first batch" of loans

7

and that she hopes to expand the Program.  Plaintiffs each received a letter from the City dated July 31, 2013 demanding to purchase a total of more than 230 loans from the Trusts.  Attached hereto as Exhibits D, E and F are true and correct copies of the City's letters addressed respectively to the BNY Mellon Trustees, U.S. Bank National Association and "Wells Fargo/Wilmington Trust."[1]

26.     None of the Trusts is incorporated in California or otherwise organized under the laws of California.  All, or nearly all, of the Trusts are organized under New York common law or Delaware law.

27.     The physical notes and other documents evidencing the mortgage loans that Defendants intend to seize all are valid and binding, and located outside of the territorial boundaries of the City.

28.     The beneficiaries of the Trusts are located across the country and the world.

**B.     Defendants**

29.     Defendant MRP is a limited liability company organized and existing under the laws of Delaware, and it is headquartered in San Francisco, California.

30.     MRP is a privately-owned, for-profit company that will manage and facilitate the loan restructuring process of the Seizure Program, including (a) raising funds to finance the seizures; (b) identifying mortgage loans to be acquired by eminent domain; and (c) arranging for the loan refinancing.  MRP will receive a $4,500 fee for each loan seized and refinanced.  In addition, MRP's investors would receive the profit between the seizure price and price at which the new loan to the homeowner is sold, net of MRP's fee, the City's fee, and any expenses incurred by MRP.  MRP has no other business operations.

31.     Defendant Gordian Sword LLC is a limited liability company organized and existing under the laws of Delaware, and it is headquartered in San Francisco, California.  It was established to create the Seizure Program and is the managing member that controls and directs

---

[1] The City's letter addressed to Plaintiff U.S. Bank National Association mistakenly omitted "Attachment B," which was described in the letter as setting forth the amount offered for each of the relevant mortgage loans.  After repeated requests, U.S. Bank National Association received a copy of "Attachment B" on August 15, 2013, and has incorporated that "Attachment B" into the version of the City's letter appended hereto as Exhibit E.

MRP.  The name Gordian Sword is an apparent reference to the Gordian Knot, a legend and metaphor for an intractable problem that is solved easily by cheating (*i.e.,* cutting the knot).

32.    On or about April 2, 2013, the City, through its City Council and upon the recommendation of its City Manager, voted to enter into an "Advisory Services Agreement" with MRP, under which MRP would provide contractual services to the City regarding, among other things, mortgage relief for City homeowners and the acquisition of existing mortgage loans through eminent domain.  It is not clear whether this is the only written agreement between the City and MRP or if there are other undisclosed oral or written agreements between them.

33.    Defendant City, a municipality, is located in Contra Costa County in the State of California, with the territorial boundaries described in Article I, section 2 of the City's Charter.

34.    Defendant Richmond City Council (the "City Council") is the City's governing body.  Defendant City Council is the governing body with legal responsibility for making decisions with respect to the City's exercise of its eminent domain powers.

## JURISDICTION AND VENUE

35.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) and (4) (jurisdiction over actions for violations of constitutional and federal rights secured by 42 U.S.C. § 1983), and over Plaintiffs' declaratory relief causes of action under 28 U.S.C. §§ 2201 and 2202.  Plaintiffs' state-law claims form part of the same case or controversy as the federal claims.  Accordingly, this Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

36.    This Court has personal jurisdiction over Defendants City and City Council, as municipalities or agents and officers of municipalities located in this judicial district.  The Court also has personal jurisdiction over those Defendants because Plaintiffs' claims arise out of actions taken by those Defendants in this judicial district.

37.    The Court has personal jurisdiction over Defendants MRP and Gordian Sword because they are headquartered in San Francisco, California, and Plaintiffs' claims arise out of MRP's and Gordian Sword's transaction of business in this judicial district.

9

38. Venue is proper in this judicial district based on 28 U.S.C. § 1391(b). Defendants City and City Council reside in this judicial district, Defendants MRP and Gordian Sword conduct business in this district, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## INTRADISTRICT ASSIGNMENT

39. Pursuant to Civil Local Rules 3-2(c) and 3-2(d), this action is properly assigned to either the San Francisco or Oakland Division of this Court, because a substantial part of the events giving rise to the claims asserted herein occurred in Contra Costa County.

## FACTUAL BACKGROUND

### I.   DEFENDANTS' SEIZURE PROGRAM

40. Defendants seek to enrich themselves through an elaborate program under which the City would use its eminent domain powers and litigation to seize residential mortgage loans, secured by owner-occupied residences in the City, held by outsiders, at steeply and unjustifiably discounted prices. MRP would then refinance those loans with new federally insured loans and sell the new loans at a substantial markup.

41. Defendants would profit by sharing in the spread between the price paid by the City (by MRP's investors) to seize the loans and the proceeds received by the City (through MRP) for selling the new loan to the homeowner to a third party. The outside-of-Richmond Trusts whose mortgage loans would be seized under the Seizure Program would lose significant value—potentially hundreds of thousands of dollars on some individual loans. Thus, the Seizure Program amounts to a seizure and transfer of wealth from private parties outside of the City, on the one hand, to other private parties, on the other hand, with the City receiving a payment as its fee for renting out its eminent domain powers.

### A.   The Seizure Program's Targeting of Performing Loans

42. The Seizure Program primarily targets for eminent domain seizure mortgage loans that meet a specific profile: (a) performing loans (meaning where the borrower is current on payment); (b) underwater (meaning that the principal loan balance is greater than the underlying home value); and (c) held by "private-label" securitization trusts (meaning that the trusts are

10

sponsored by a private entity, rather than by a Government-Sponsored Enterprise (GSEs), such a Fannie Mae and Freddie Mac).[2]

43.     The Seizure Program seeks to cherry-pick loans that are "relatively current (not in default)," and only from "*borrowers who appear likely to repay their loans*." *See* Exhibit G at 9 (emphasis added).[3]  Thus, the Seizure Program does not target loans where there is a serious risk of default (much less a serious risk of foreclosure).  Indeed, of the approximately 624 loans that the City has offered to purchase, approximately 85% are not in any stage of the foreclosure process and approximately 81% of the loans have never had a notice of default filed or are now current.  Of the 105 loans held by Plaintiffs BNY Mellon Trustees, for example, over 90% are not in any stage of the foreclosure process.

44.     The stated justifications for the Seizure Program—to prevent "blight" or some other "public" harm caused by foreclosures—are mere pretexts for this profit-driven scheme.  Indeed, the fact that the Seizure Program primarily targets performing loans—loans that will be the most profitable to restructure and sell but are the least likely to default—shows that the Seizure Program is designed to create profits for MRP and its investors.

45.     MRP has included a small percentage of loans in default or foreclosure for optics only, in a thinly-veiled attempt to justify its scheme under the guise of public good.  The Seizure Program is not structured to help borrowers actually facing foreclosure because such borrowers are a bad credit risk, unlikely to qualify for refinancing.  In MRP's own words, one of the "key steps to the MRP process" is that "[h]omeowners who opt into the program, but do not qualify for a refinance or a lease *will be dropped* from the eminent domain motion before their mortgage is purchased." *See* Exhibit H at 13 (emphasis added).[4]

---

[2] The Seizure Program has been described in several public sources, attached hereto as Exhibits G and H.
[3] *Available at* http://online.wsj.com/public/resources/documents/EMINENT-powerpoint.pdf (last visited August 7, 2013).
[4] *Available at* http://sireweb.ci.richmond.ca.us/sirepub/cache/2/mb1qpzgj4mcgl3zqu31kl0y3/36546408062013 071309684.PDF (last visited August 7, 2013).  This presentation is attached to explain the Seizure Program, which would be unlawful if fully implemented.

46.     Defendants attempt to justify the Seizure Program as correcting what they claim to be a contractual bar on forgiving principal in securitization trusts *See, e.g.*, Exhibit H at 5.  As to the Trusts administered by Plaintiffs, that is simply false.  But loan servicers can and do forgive principal when doing so would maximize the value of the loan.

47.     Another seemingly arbitrary provision is that the Seizure Program is limited to loans held by private RMBS trusts, all located outside of the City of Richmond.

48.     The Seizure Program excludes loans held by trusts sponsored and guaranteed by Freddie Mac or Fannie Mae.  It also excludes loans held directly by banks.  These exceptions demonstrate that the stated justifications are a pretext and appear intended to minimize opposition from local banks and federal agencies.

**B.     The Seizure and Refinancing of the Targeted Loans**

49.     Having now selected loans held by the Trusts for seizure, the City will attempt to seize the loan through eminent domain for a fraction of its value.[5]  The example frequently given by MRP of its proposed valuation methodology is that for a loan with a principal balance of $300,000 secured by a home worth $200,000, Defendants would seize the loan at $160,000.  *See* Exhibit H at 7, 16-18.

50.     Once Defendants expropriate each loan for less than fair market value, they then intend to replace it with a new loan to be sold into a FHA securitized pool in an amount equal to approximately 95% of the underlying home value.  Defendants and MRP's investors would profit by sharing the spread between the discounted seizure price and the 95% refinancing price.  *See id.*

51.     Because the loans are underwater (*i.e.*, the home value is less than the outstanding principal balance), Defendants have calculated a discounted valuation that is far lower than the unpaid principal balance of the loan.

---

[5] In one instance, the City's July 31, 2013 letter addressed to Plaintiffs BNY Mellon Trustees offered a mere 11% of the principal balance of the loan.  *See* Exhibit D at Trustee Exhibit B therein.  The letter received by Plaintiff U.S. Bank National Association included an offer priced at just 7% of the balance of the subject loan.  *See* Exhibit E at Trustee Exhibit B therein. Moreover, while the City's letter addressed to Plaintiff Wilmington Trust referred to an "Attachment B" as setting forth the amount and basis for the City's offer to acquire the relevant mortgage loans, the attachment included no clear basis for the City's offer.  *See* Exhibit F.

52.     The offers also are totally disconnected from, and far less than, any measure of fair value.  Defendants have primarily selected loans that are current and not in foreclosure.  The fair value of such loans includes the anticipated principal and interest payments over the life of the loan.  That is especially so for long-term holders of the loans like the Trusts, which were designed to hold loans to maturity, not to trade them in the market.

**C.     Defendants Have Taken Substantial Steps Towards Implementing the Seizure Program.**

53.     Defendants have taken substantial steps towards implementing the Seizure Program.  In April 2013, the City entered into an "Advisory Services Agreement" with MRP, which is an operative agreement between the City and MRP with respect to the Seizure Program, attached hereto as Exhibits I (agreement) and J (City Council minutes indicating approval).  Recently, MRP began sending letters to Plaintiffs and other trustees and servicers for RMBS trusts stating that unidentified California cities were interested in acquiring mortgage loans and would soon be making purchase offers on the loans, one of the prerequisites under California eminent domain law before a local government can seize property.

54.     On multiple occasions over the past months, the Mayor of Richmond or other City officials have publicly discussed the City's implementation of the Seizure Program, including confirming that the City Council entered into a partnership with MRP to implement the Seizure Program and discussing MRP and the City's readiness to begin implementing the Seizure Program.

55.     On or about July 31, 2013, Richmond sent letters to Plaintiffs (attached hereto as Exhibits D, E, and F) and other trustees and servicers for RMBS trusts making offers to purchase loans from the Trusts.  The offer letters attached a list of approximately 624 mortgage loans purportedly held by RMBS trusts (including more than 230 purportedly held by the Trusts) that the City is offering to acquire, "at the present time."[6]  The letters state that the offers are not binding on the City but provide a deadline of August 13, 2013 for Plaintiffs to respond, after

_____

[6] Notably, a majority of the loans identified in the letter sent to Wilmington Trust are not owned by a trust for which Wilmington acts as trustee.

which the City may "decide[] to proceed with the acquisition of the loans through eminent domain." After sending the letters, the Mayor of Richmond reportedly declared: "If financial institutions do not cooperate, the city will seize the loans using eminent domain." *See* Exhibit K hereto.[7] The City's offer letters constitute a first wave of offers, and if Defendants are successful in acquiring or seizing these loans, it is expected that they will attempt to acquire or seize many other loans.

56. If the offers are not accepted, the City will attempt to quickly seize possession of the loans. The City Council must first hold a condemnation hearing, and immediately thereafter could file an eminent domain lawsuit in California and use an expedited procedure known as a "quick take" to quickly obtain a court order giving the City possession of the loan. MRP has indicated that the "quick take" procedure is a critical component of the Seizure Program. *See* Exhibit L hereto at 3.[8] Once the City receives possession of the loans, it could then extinguish, restructure, and refinance them, causing immediate and irreparable harm to the Trusts that will be exceedingly difficult, if not impossible, to unwind.

57. Thus, there is a high likelihood that Defendants will very soon exercise the City's eminent domain powers to seize possession of mortgage loans under the Seizure Program.

## II. IMPLEMENTATION OF THE SEIZURE PROGRAM WOULD RESULT IN SIGNIFICANT HARM TO THE TRUSTS AND WILL AFFECT INTERSTATE COMMERCE

### A. Harm to the Trusts

58. If implemented, the Seizure Program would cause significant harm to the Trusts.

59. First, the targeting of performing loans within the Trusts' portfolios would, by itself, completely upend the purpose of the securitization process. The structure and value of a particular securitization trust is based upon diversification of loans, in both the terms of the loans and the geographic location of the property secured by the loans, and the associated risks. RMBS trusts are dependent on the stable and non-saleable nature of performing loans within the

---

[7] *Available at* http://www.latimes.com/business/money/la-fi-mo-richmond-eminent-domain-20130730,0,7196420.story.

[8] *Available at* http://online.wsj.com/public/resources/documents/EMINENT-faqs.pdf.

pool.  Cherry-picking performing loans from the Trusts disrupts the risk diversification on which the Trusts were structured.

60.    Second, the number of loans targeted in the City alone—hundreds of mortgage loans—would cause significant direct losses to the Trusts and other RMBS trusts.  Indeed, the first wave of the approximately 624 loans targeted by Defendants could potentially cause losses to the RMBS trusts holding those loans of over $90 million or more.

61.    Third, there is a risk that the takings could jeopardize the Trusts' tax status.  The Trusts are organized as Real Estate Mortgage Investment Conduits (REMICs), a status that Congress created to apply uniformly on a national basis to encourage securitization of static pools of residential mortgage loans.  The REMIC regulations do not permit the transfer of non-defaulted loans out of the trusts without the imposition of potentially significant and adverse tax consequences, nor do they contemplate the City's unprecedented seizure of mortgage loans from securitized trusts.  Particularly if the Seizure Program is copied by other municipalities, the IRS may find that the Trusts are not REMIC-eligible.  If as a result of the seizure of such loans, the IRS concluded that the Trusts are no longer REMIC-eligible, the results of that finding would be catastrophic:  the Trusts, which currently pay no tax at the trust level, would be subject to a 35% tax on all of their income.  That tax liability could result in a sharp loss of income for pension funds, retirees, and others who rely on regular payments from these securities.

62.    Fourth, many other municipalities across the U.S. are watching to see whether Defendants are able to carry out the Seizure Program.  If even a few other municipalities of City's size implement the Seizure Program, losses could range in the billions of dollars.  If more than a few implement the Seizure Program, far greater losses could mount.  This widespread transfer of substantial funds from the Trusts' beneficiaries, including municipal pension funds and private retirement plans, on the one hand, to Defendants, on the other hand, could destabilize the national housing market and the larger economy.

**B.    The Effect on Interstate Commerce and the National Housing Market**

63.    The Seizure Program also would cause significant harm to interstate commerce and the national housing market.  As a preliminary matter, because the Trusts and the loans are

15

located out of California, the Seizure Program would coerce interstate transactions.
Additionally, the Seizure Program is expressly designed to favor local interests—MRP and
underwater homeowners—at the expense of out-of-state creditors.  Furthermore, in addition to
the losses suffered by the Trusts from the seizure of performing residential mortgage loans at
below fair market values, the Seizure Program would have a chilling effect on the extension of
credit to homeowners.  The Seizure Program also will disrupt the national nature of the mortgage
market by subjecting investors to qualitatively different types of risk in different jurisdictions.
Mortgage rates would rise, and some prospective homeowners may be unable to obtain loans at
all, lowering housing prices across the country.

64.     Further, the Seizure Program would undermine investor confidence in the
residential mortgage-backed securities market, and by extension, the national housing market
and national economy.  The securitization market would be upended, as investors in residential
mortgage-backed securities would be unable to adequately evaluate underlying mortgage pools
that collateralize their investment, and prices for affected securities would decrease.  A broad
range of investors hold interests in residential mortgage-backed securitizations as part of
common diversification strategies.  Thus, the detrimental effects of a valuation crisis as to the
securities evidencing such interests would flow through the national housing market, and
likewise, the larger economy.

65.     Likewise, industries dependent on a vibrant housing market and an active home
lending environment would suffer, such as the home building, construction, and realty industries.

66.     In comments published in the Federal Register, 77 Fed. Reg. 47,652 (August 9,
2012) discussing the "Use of Eminent Domain To Restructure Performing Loans," the FHFA
recognized the harm that programs like the Seizure Program would cause.  Among other things,
FHFA has explained that the GSEs, as well as the multiple Federal Home Loan Banks for which
FHFA acts as a regulator, because they are substantial holders of RMBS trusts, would be
harmed, as well as the communities themselves that attempt to use eminent domain.  According
to FHFA:

FHFA has significant concerns about the use of eminent domain to revise

16

existing financial contracts and the alteration of the value of Enterprise or Bank securities holdings. In the case of the Enterprises, resulting losses from such a program would represent a cost ultimately borne by taxpayers. At the same time, FHFA has significant concerns with programs that could undermine and have a chilling effect on the extension of credit to borrowers seeking to become homeowners and on investors that support the housing market.

FHFA has determined that action may be necessary on its part as conservator for the Enterprises and as regulator for the Banks to avoid a risk to safe and sound operations and to avoid taxpayer expense.

Among questions raised regarding the proposed use of eminent domain are the constitutionality of such use; the application of federal and state consumer protection laws; the effects on holders of existing securities; the impact on millions of negotiated and performing mortgage contracts; the role of courts in administering or overseeing such a program, including available judicial resources; fees and costs attendant to such programs; and, in particular, critical issues surrounding the valuation by local governments of complex contractual arrangements that are traded in national and international markets.

67.     Likewise, the U.S. House of Representatives Financial Services Committee, which has oversight of Fannie Mae and Freddie Mac, recently issued a draft reform bill, a stated purpose of which is to implement the following reform: "To combat constitutionally-suspect 'eminent domain' schemes by local municipalities to seize mortgages out of legally binding securities for purposes of rewriting their terms, prohibit the GSEs from purchasing or guaranteeing loans originated in municipalities where such practices have been employed during the last ten years." Executive Summary of the Protecting American Homeowners (PATH) Act, July 11, 2013, at 2.[9]

68.     The concerns expressed by the FHFA and the House Financial Services Committee are well-founded. The Seizure Program will have a devastating effect on interstate commerce, including on the mortgage-backed securities market and the national housing market, and would detrimentally affect both borrowers and lenders.

C.     **The Adverse Effects on the City and Its Homeowners**

69.     The City, and its residents, would not be spared from the harm caused by the Seizure Program. The Seizure Program will have negative consequences for borrowers and prospective homeowners with respect to lending products in communities that seize mortgage loans at unfairly reduced values through eminent domain. The risks associated with lending in

---

[9] *Available at*
http://financialservices.house.gov/news/documentsingle.aspx?DocumentID=342165.

1  such communities will force lenders to place more stringent conditions on borrowers seeking a

2  mortgage.  With less people qualifying for mortgages, homeownership rates would drop and

3  property values would plummet.

4        70.    The relatively small number of select City homeowners who could potentially

5  receive a windfall under the Program by having their underwater mortgages refinanced will not

6  offset the devastation to the local housing market and economy due to the Seizure Program's

7  chilling effect on credit.

8        71.    City homeowners whose loans are in the Seizure Program actually may be

9  damaged by it.  Debt forgiveness generally is treated as taxable income for both state and federal

10  income tax purposes.  The Seizure Program intends to seize loans at a price that is hundreds of

11  thousands of dollars lower than the principal balance on the loan.  This principal balance

12  reduction may be treated as debt forgiveness and subject to income tax.  Thus, these select City

13  homeowners could owe upwards of six figures in income tax liability.  Even more, unlike

14  mortgage debt, income tax debt is not necessarily dischargeable in bankruptcy.  Instead of

15  creating more stable neighborhoods, having more money in our local economy to stimulate

16  community wealth, and saving homeowners money on their mortgage payments, as MRP and the

17  City claim will happen, the Seizure Program in fact may undermine the growing economy and

18  push the City back into recession.  Although certain federal and state programs temporarily allow

19  for mortgage debt forgiveness to be excluded from taxable income, it is far from clear whether

20  the Seizure Program would qualify for any such exclusion or whether the Seizure Program would

21  complete the seizure process before the expiration of the tax holiday at the end of 2013.

22  **III.**    **INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IMMEDIATE AND**

23          **IRREPARABLE HARM.**

24        72.    Defendants should be enjoined from implementing the Seizure Program.  The

25  Seizure Program would cause significant and widespread harm, and the transactions that will

26  occur under the Seizure Program will be exceedingly difficult, if not impossible, to unwind.

27        73.    Under the Seizure Program, once new loans are issued to refinance the original

28  loans, they would be securitized.  Thus, to unwind these unlawful seizures would require

1  extinguishing the new loan—thereby harming the new trust that holds that loan, and its

2  beneficiaries—and then reinstating the homeowner's old loan.  It is doubtful that either step of

3  this process could occur—that is, that MRP could "claw back" the new loan, and any payments

4  that have been made, from the new trust and its investors, or that the Trusts could reinstate the

5  old loans.

6       74.  Nor could money damages adequately compensate the Trusts.  First, widespread

7  seizure and extinguishment of the loans may cause significant damage to the Trusts and their

8  beneficiaries, including, among other things, causing the Trusts to lose their REMIC status and

9  affecting the credit rating of the Trusts' certificates and the market value of trust securities,

10  which could cause systemic problems for other RMBS securitizations and their

11  Certificateholders—including the Trusts—that cannot be compensated by money damages.

12       75.  Second, even if money damages could somehow be adequate, there is serious

13  doubt that Defendants would have the financial means necessary to compensate the Trusts (at the

14  same time that they also must compensate all similarly-situated RMBS trusts) for the potentially

15  hundreds of millions of dollars in losses caused by the Seizure Program, in which case the Trusts

16  will be left without recourse for their loss.

17                      **JUSTICIABLE DISPUTE**

18       76.  By reason of the foregoing, there now exists a justiciable dispute and controversy

19  for which immediate relief is necessary.

20       77.  Accordingly, Plaintiffs seek injunctive and declaratory relief as set forth herein.

21

22

23

24

25

26

27

28

**CLAIMS FOR RELIEF**

**FIRST CLAIM**

**(DECLARATORY RELIEF REGARDING VIOLATION OF THE "PUBLIC USE"**

**REQUIREMENT OF THE TAKINGS CLAUSES OF THE U.S. AND CALIFORNIA**

**CONSTITUTIONS, THE RICHMOND CITY CHARTER, AND CLAIM UNDER 42**

**U.S.C. § 1983)**

**(AGAINST ALL DEFENDANTS)**

78.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

79.     The Fifth Amendment to the U.S. Constitution provides that "private property" shall not be "taken for public use, without just compensation" (the "Takings Clause").  This requirement is incorporated and made applicable to the states and their political subdivisions and actors by the Fourteenth Amendment of the U.S. Constitution.

80.     42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

81.     California Constitution Article I, section 19 provides that private property may be taken only for a "public use."

82.     The Richmond City Charter Article II, section 19 provides that a private property may be taken only for a "public use."

83.     The Seizure Program is carried out by Defendants, who are inextricably intertwined, under the color of state law.

84.     The Seizure Program violates the "public use" requirement of the Takings Clause of the Fifth and Fourteenth Amendments, the California Constitution, and the Richmond City Charter.

85.     The Seizure Program is not implemented for a public purpose, but rather for the purpose of seizing property from one set of private entities (the Trusts) to enrich MRP, a private investment firm, and its investors.  Even if individual homeowners do benefit, and those benefits are not wiped out by, for example, federal tax liability, those homeowners are private parties as well.

86.     The stated justifications for the Seizure Program—to prevent "blight" or some other "public" harm caused by foreclosures—are mere pretexts for this profit-driven scheme. Indeed, the fact that the Seizure Program primarily targets performing loans—loans that will be the most profitable to restructure and sell but are the least likely to default—shows that the Seizure Program is designed to create profits for MRP and its investors.  Furthermore, even if the purported justification of preventing future foreclosures were true, prevention of future blight or harm is not a valid public use.

87.     In addition, the Seizure Program would not benefit the City's citizens on a whole, but would instead lead to windfalls for the select group of homeowners who meet a loan profile profitable to MRP and its investors, to the detriment of all others.  Even this small group of intended beneficiaries may receive a severe tax burden that would offset any windfall and may worsen the homeowners' financial situations.  Further, the Seizure Program expressly excludes many borrowers and primarily targets performing mortgage loans that are not in default or foreclosure.  If the Seizure Program is fully implemented and performing loans are seized for well-below their unpaid principal balance, and thus at significant losses to the Trusts holding those loans, lenders will be unwilling to extend credit in the City at the current level, creating, at a minimum, a chilling effect on the local home lending environment.  This will have severe consequences for current and prospective City homeowners.

88.     For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

89.     Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent. If those seizures occur, the Trusts will be irreparably harmed.

90.     Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would violate the Fifth and Fourteenth Amendments of the U.S. Constitution, Article I, section 19 of the California Constitution, and Article II, section 19 of the Richmond Charter, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

**SECOND CLAIM**

**(DECLARATORY RELIEF REGARDING VIOLATION OF THE PROHIBITIONS AGAINST EXTRATERRITORIAL SEIZURES UNDER THE TAKINGS CLAUSES OF THE U.S. AND CALIFORNIA CONSTITUTIONS AND THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND CLAIM UNDER 42 U.S.C. § 1983)**

**(AGAINST ALL DEFENDANTS)**

91.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

92.     The Fifth Amendment to the U.S. Constitution prohibits a local government from extraterritorially seizing property pursuant to eminent domain powers. This requirement is incorporated and made applicable to the states and their political subdivisions and actors by the Fourteenth Amendment of the U.S. Constitution.

93.     42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

94.     The California Constitution prohibits local governments from extraterritorially seizing property pursuant to eminent domain powers.

95.     Under section 1240.050 of the California Code of Civil Procedure, a local public entity may acquire by eminent domain only property located within its territorial limits.  Under section 1250.020 of the California Code of Civil Procedure, an eminent domain proceeding must be commenced in the county in which the property sought to be taken is located.

96.     The Seizure Program is carried out by Defendants, who are inextricably intertwined, under the color of state law.

97.     Defendants' implementation of the Seizure Program violates prohibitions against extraterritorial property seizures under the Fifth and Fourteenth Amendments of the U.S. Constitution, the California Constitution, and the California Code of Civil Procedure.  The debt instruments that Defendants target under the Seizure Program are not located within the territorial boundaries of the City and are held by Trusts located outside of Richmond.  Because the situs of a debt instrument for eminent domain purposes is the location of the physical instrument, and the situs of an intangible debt is the location of the creditor, Defendants have no power to seize these outside-of-Richmond debts.

98.     In addition, the notes evidencing the mortgage loans are held outside of the territorial boundaries of the City.  Defendants have no power to effect extraterritorial seizures of those tangible instruments.

99.     For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

100.     Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent.  If those seizures occur, the Trusts will be irreparably harmed.

101.     Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would violate the Fifth and Fourteenth Amendments of the U.S. Constitution, the California Constitution, and the California Code of Civil Procedure, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

23

**THIRD CLAIM**

**(DECLARATORY RELIEF REGARDING VIOLATION OF THE COMMERCE**

**CLAUSE OF THE U.S. CONSTITUTION AND CLAIM UNDER 42 U.S.C. § 1983)**

**(AGAINST ALL DEFENDANTS)**

102.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

103.    Article I, section 8, clause 3 of the U.S. Constitution (the "Commerce Clause") gives Congress the power to regulate commerce among the several states.  The Commerce Clause bars states and their political subdivisions from taking action designed to benefit in-state economic interests by burdening out-of-state interests.  Direct regulation of interstate commerce by the states and their political subdivisions is prohibited, and incidental regulation is permissible only where the burden imposed on such commerce is not excessive in comparison with the putative local benefits.

104.    42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

105.    The Seizure Program is carried out by Defendants, who are inextricably intertwined, under the color of state law.

106.    Defendants violate the Commerce Clause of the U.S. Constitution by implementing the Seizure Program, which is designed to benefit local Defendants' own economic interests at the expense of out-of-Richmond and out-of-state interests, including the Trusts that hold the mortgage loans targeted for seizure.

107.    In addition, the Seizure Program is a direct regulation of interstate commerce by the City.  The Seizure Program expressly targets for seizure private-label mortgage loans held by out-of-Richmond and out-of-state Trusts.  The Seizure Program thus seeks to impermissibly coerce interstate transactions.  In addition, the Trusts are investment vehicles designed to

24

distribute economic and financial risk by holding a diversified collateral base of mortgage loans, including loans that are diverse based on, among other factors, their geographic and risk profiles. Thus, by design, the Trusts hold not only loans secured by property in the City or even California, but from a variety of states and localities.

108.    Also, the private-label mortgage loans targeted by MRP at issue here were acquired by a private sponsor, who securitized them in private RMBS Trusts, in which the loans are serviced, and mortgage payments flow through the Trusts to be ultimately distributed to the Trusts' beneficiaries.  Therefore, the Seizure Program would directly regulate an investment structure that by its very nature depends on a pool of collateral located in different states, and on the interstate flows of proceeds from homeowners, to loan servicers, to the Trusts, and then ultimately to the Trusts' investors.

109.    Furthermore, the residential mortgage-backed securities market is a national industry that crosses state lines, with investors and other market participants located throughout the country.  The Seizure Program would significantly and directly regulate, if not destroy, this market by seizing assets from nationwide trusts.

110.    Moreover, the burden imposed on interstate commerce by the Seizure Program would be excessive, and would greatly outweigh any purported benefits to the City and its residents.  Among other things, the Seizure Program could cause tens of millions of dollars in losses to the trusts that hold the approximately 624 targeted mortgage loans, which is just the first wave of the Seizure Program.  It also would upend the heavily negotiated investment structures used across the national residential mortgage backed securitization industry, diminish investor confidence in such structures, and have a chilling effect on credit and insurance of mortgaged properties and loans throughout the U.S.  Moreover, it could severely disrupt the uniform application of the REMIC rules, which Congress enacted to encourage private securitization.  In addition, the purported benefits to the City—preventing foreclosures and their local consequences—are non-existent.  The Seizure Program does not aim to seize loans in default or at serious risk of default or foreclosure, but performing loans at low risk of default, which would not address the harms that the Seizure Program purports to prevent.  The potential

25

benefits to the relatively small number of private City homeowners receiving a windfall under the Seizure Program (should that windfall not be blown away by the tax liability) would not outweigh the harm that the Seizure Program would cause to the Trusts and the national economy.

111.    For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

112.    Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent.  If those seizures occur, the Trusts will be irreparably harmed.

113.    Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would violate the Commerce Clause of the U.S. Constitution, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

**FOURTH CLAIM**

**(DECLARATORY RELIEF REGARDING VIOLATION OF THE CONTRACTS CLAUSE OF THE U.S. CONSTITUTION AND CLAIM UNDER 42 U.S.C. § 1983)**

**(AGAINST ALL DEFENDANTS)**

114.    Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

115.    Article I, section 10 of the U.S. Constitution—the "Contracts Clause"—prohibits states from "impairing the Obligation of Contracts."  The Contracts Clause prevents states and their political subdivisions from passing any law that would abrogate debts of their citizens, where that law would impair commercial intercourse and threaten the existence of credit.

116.    42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

117.   The Seizure Program is carried out by Defendants, who are inextricably intertwined, under the color of state law.

118.   Defendants violate the Contracts Clause by implementing a scheme that would severely impair the Trusts' contractual rights to receive full payments of unpaid principal from borrowers.  In exchange, the Seizure Program provides cash payments worth significantly less than the rights abrogated by Defendants.  The purpose of this significant impairment of contractual rights is improper and without a legitimate public purpose or necessity: to abrogate debts owed by a selected group of that jurisdiction's residents while enriching a private investment firm and its backers.

119.   For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

120.   Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent.  If those seizures occur, the Trusts will be irreparably harmed.

121.   Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would violate the Contracts Clause of the U.S. Constitution, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

## FIFTH CLAIM

**(DECLARATORY RELIEF REGARDING VIOLATION OF THE "JUST COMPENSATION" REQUIREMENTS OF THE TAKINGS CLAUSE OF THE U.S. AND CALIFORNIA CONSTITUTIONS AND CLAIM 42 U.S.C. § 1983)**

**(AGAINST ALL DEFENDANTS)**

122.   Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

123.   The Fifth Amendment to the U.S. Constitution provides that "private property" shall not be "taken for public use, without just compensation."  This requirement is incorporated

27

and made applicable to the states and their political subdivisions and actors by the Fourteenth Amendment of the U.S. Constitution.

124.   42 U.S.C. § 1983 provides that any person, acting under the color of state law, that subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of any rights, privileges, or immunities under the Constitution, shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress.

125.   A property owner is entitled to just compensation for any taking under Article I, section 19 of the California Constitution.  California Code of Civil Procedure § 1263.320 provides that the test for assessing "fair market value" for purposes of the "just compensation" requirement is the highest price that a hypothetical buyer and seller would agree to in the marketplace, assuming both were willing and able to complete the transaction but had no particular or urgent necessity to do so.

126.   The Seizure Program is carried out by Defendants, who are inextricably intertwined, under the color of state law.

127.   Defendants violate the just compensation requirements of the Takings Clause of the U.S. Constitution and California Constitution.  The Seizure Program proposes seizing performing mortgage loans at fractions of their unpaid principal balance, prices that are below the fair market value even if the loans would be in default.  To achieve its profit goals, the Seizure Program must compensate the Trusts inadequately by seizing loans at prices far less than their actual or fair market values.  This unconstitutional feature of the Seizure Program is not merely a question of the valuation of a single property, but is central to the Seizure Program's financing and viability.

128.   For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

129.     Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent.  If those seizures occur, the Trusts will be irreparably harmed.

130.     Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would violate the Takings Clause of the U.S. Constitution and California Constitution, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

## SIXTH CLAIM

### (DECLARATORY RELIEF REGARDING TORTIOUS INTERFERENCE WITH CONTRACT)

### (AGAINST ALL DEFENDANTS)

131.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

132.     Under California law, a defendant commits the tort of intentional interference with contract where: (1) there is a valid contract between plaintiff and a third party; (2) defendant has knowledge of the contract; (3) defendant's intentional acts are designed to induce a disruption of the contractual relationship; (4) the contractual relationship is disrupted; and (5) the disruption results in damages.

133.     The implementation of the Seizure Program would constitute tortious interference with contracts.  The loan agreements are valid contracts.  Defendants have knowledge of those contracts, especially as Defendants select which loans to target for seizure based on certain terms of those contracts, such as the principal balance of the loans.  The Seizure Program is designed to induce a disruption of the contractual relationship for Defendants' own profit, by extinguishing those contracts through the City's eminent domain powers so that the loans can be refinanced by the Defendants for a substantial profit.  The Seizure Program is unconstitutional under the United States and California constitutions, and violates California's statutory restriction on the use of eminent domain, and therefore Defendants are causing the disruption of the borrowers' contracts

29

with the Trusts through wrongful means—*i.e.*, the illegal Seizure Program. Moreover, the disruption of the Trusts' contracts is not merely an incidental effect of the seizures; the contracts are the very object of the seizure, and their abrogation is the purpose of the Seizure Program. The disruption to the contractual relationship that would be caused by the Seizure Program will result in significant damages to the Trusts that are parties to the contracts, and should be enjoined and declared unlawful.

134. For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

135. Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent. If those seizures occur, the Trusts will be irreparably harmed.

136. Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would constitute tortious interference with contract, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

## SEVENTH CLAIM

## (DECLARATORY RELIEF REGARDING VIOLATION OF CAL. CODE CIV. PROC. § 1240.030)

## (AGAINST ALL DEFENDANTS)

137. Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

138. Section 1240.030 of the California Code of Civil Procedure provides that the power of eminent domain may exercised to acquire property "only if all of the following are established: (a) The public interest and necessity require the project. (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least public injury. (c) The property sought to be acquired is necessary for the project."

139.     The Seizure Program violates section 1240.030 because public interest and necessity do not require the seizure of the Trusts' loans under the Seizure Program, and it is not planned in the manner that is the most compatible with the greatest public good and the least private injury.  Far from being required or from being implemented for the public good, the Seizure Program has been devised for the purpose of seizing property from one set of private entities (the Trusts) to enrich MRP, a private investment firm, and its investors.  The fact that the Seizure Program principally targets performing loans shows that it is not designed to prevent foreclosures or their economic consequences, but rather to confer private benefits on a select set of individuals.

140.     In addition, the Seizure Program would not benefit the City's residents as a whole, but would instead lead to windfalls for the select group of homeowners that meet a loan profile profitable to Defendants and MRP's investors, to the detriment of all others.  Even this small group of intended beneficiaries may receive a severe tax burden that would offset any windfall and may worsen their financial situations.  Further, the Seizure Program expressly excludes many borrowers and principally targets performing mortgage loans that are not in default or foreclosure.  If the Seizure Program is fully implemented and performing loans are seized for well-below their unpaid principal balance, and thus at significant losses to the Trusts holding those loans, future lenders will be unwilling to extend credit in Richmond at the current level, creating, at a minimum, a chilling effect on the local home lending environment.  This will have severe consequences for current and prospective City homeowners.

141.     As described above, the private injury that this Seizure Program would inflict will vastly outweigh its minimal or nonexistent benefits.

142.     For all of the reasons asserted herein, there is an actual controversy between Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

143.     Defendants have taken substantial steps towards seizing loans under the Seizure Program, and such seizures are imminent.  If those seizures occur, the Trusts will be irreparably harmed.

31

144.     Accordingly, Plaintiffs respectfully request that the Court issue a judgment for declaratory and injunctive relief against Defendants, declaring that the implementation of the Seizure Program would violate section 1240.030 of the California Code of Civil Procedure, and permanently enjoining Defendants from implementing any aspect of the Seizure Program.

## EIGHTH CLAIM

**(ALTERNATIVE CLAIM FOR DECLARATORY RELIEF REGARDING VIOLATION OF THE PROHIBITION AGAINST TAKING OWNER-OCCUPIED RESIDENCES FOR THE PURPOSE OF CONVEYING IT TO A PRIVATE PERSON UNDER THE CALIFORNIA CONSTITUTION)**

**(AGAINST ALL DEFENDANTS)**

145.     Plaintiffs repeat and reallege the allegations contained in each preceding paragraph as if fully set forth herein.

146.     Plaintiffs plead this claim as an alternative to other alleged claims and only to the extent that the mortgage loans constitute an owner-occupied residence in the City, and thus, Article I, section 19(b) of the California Constitution applies and renders the Seizure Program unconstitutional.

147.     Article I, section 19(b) of the California Constitution provides that "local governments are prohibited from acquiring by eminent domain an owner-occupied residence for the purpose of conveying it to a private person."

148.     As an alternative to the claims pleaded above, if the Court determines that the mortgage loans at issue in the Seizure Program constitute owner-occupied residences in the City, the Seizure Program would thus violate the California Constitution's prohibition against taking owner-occupied residences for the purpose of conveying them to a private person.  The Seizure Program is implemented expressly for the purpose of seizing an interest in an owner-occupied residence to convey to (and enrich) private entities including MRP, a private investment firm, and its investors, which are funding the seizures.  Indeed, the Seizure Program hinges on the City exercising eminent domain solely to convey the interest seized to private entities and those

1  entities' supplying the City with the funds to conduct the seizure.  Without these features, the

2  Seizure Program collapses.

3  149.    As an alternative to the claims pleaded above, the Seizure Program does not

4  qualify for the exceptions to this prohibition because the stated justifications for the Seizure

5  Program—to prevent foreclosures and their attendant economic affects—are mere pretexts for

6  this profit-driven scheme.  Furthermore, the Seizure Program will inflict significant harm, both

7  locally and nationally, with no likely benefit to the City or its residents.

8  150.    For all of the reasons asserted herein, there is an actual controversy between

9  Plaintiffs and Defendants sufficient for a declaratory judgment pursuant to 28 U.S.C. §§ 2201

10  and 2202.

11  151.    Defendants have taken substantial steps towards seizing loans under the Seizure

12  Program, and such seizures are imminent.  If those seizures occur, the Trusts will be irreparably

13  harmed.

14  152.    Accordingly, Plaintiffs respectfully request that the Court issue a judgment for

15  declaratory and injunctive relief against Defendants, declaring that the implementation of the

16  Seizure Program would violate Article I, section 19(b) of the California Constitution, and

17  permanently enjoining Defendants from implementing any aspect of the Seizure Program.

18  **PRAYER FOR RELIEF**

19  WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their

20  favor on all claims asserted in the Complaint and that the Court:

21  A.    Declare that Defendants' implementation of the Seizure Program violates the

22  Takings Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States,

23  and enjoin Defendants from implementing the Seizure Program on that basis;

24  B.    Declare that Defendants' implementation of the Seizure Program violates the

25  Commerce Clause of the Constitution of the United States, and enjoin Defendants from

26  implementing the Seizure Program on that basis;

27

28

C.     Declare that Defendants' implementation of the Seizure Program violates the Contracts Clause of the Constitution of the United States, and enjoin Defendants from implementing the Seizure Program on that basis;

D.     Declare that Defendants' implementation of the Seizure Program violates Article I, section 19(a) of the Constitution of the State of California, and enjoin Defendants from implementing the Seizure Program on that basis;

E.     Alternatively, declare that Defendants' implementation of the Seizure Program violates Article I, section 19(b) of the California Constitution, and enjoin Defendants from implementing the Seizure Program on that basis;

F.     Declare that Defendants' implementation of the Seizure Program violates Article II, section 19 of the Richmond City Charter, and enjoin Defendants from implementing the Seizure Program on that basis;

G.     Declare that Defendants' implementation of the Seizure Program violates section 1263.320 of the California Code of Civil Procedure, and enjoin Defendants from implementing the Seizure Program on that basis;

H.     Declare that Defendants' implementation of the Seizure Program violates section 1240.050 of the California Code of Civil Procedure, and enjoin Defendants from implementing the Seizure Program on that basis;

I.     Declare that Defendants' implementation of the Seizure Program violates section 1240.030 of the California Code of Civil Procedure, and enjoin Defendants from implementing the Seizure Program on that basis;

J.     Declare that Defendants' implementation of the Seizure Program constitutes tortious interference with contract and, enjoin Defendants from implementing the Seizure Program on that basis;

K.     Declare that Defendants' Implementation of the Seizure Program constitutes a violation of 42 U.S.C. § 1983 and, enjoin Defendants from implementing the Seizure Program on that basis;

34

1        L.       Issue a temporary restraining order and preliminary and permanent injunctions

2   restraining Defendants, their officers, employees, agents, successors, and assigns from

3   implementing the Seizure Program;

4        M.      Award to Plaintiffs the costs and expenses of suit and counsel fees pursuant to 42

5   U.S.C. § 1988; and

6        N.      Award to Plaintiffs such other and further relief as this Court may deem just and

7   proper.

Dated:  August 22, 2013

MAYER BROWN LLP
DONALD M. FALK
BRONWYN F. POLLOCK


By: */s/ Bronwyn F. Pollock*
    Bronwyn F. Pollock
Attorneys for Plaintiffs
THE BANK OF NEW YORK MELLON
(f/k/a The Bank of New York) and THE BANK
OF NEW YORK MELLON TRUST COMPANY,
N.A. (f/k/a The Bank of New York Trust
Company, N.A.), as Trustees


JONES DAY
BRIAN D. HERSHMAN (SBN 168175)
*bhershman@jonesday.com*
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Tel: 213-489-3939
Fax: 213-243-2539

JONES DAY
MATTHEW A. MARTEL
(*pro hac vice*)
*mmartel@jonesday.com*
JOSEPH B. SCONYERS
(*pro hac vice*)
*jsconyers@jonesday.com*
100 High Street, 21st Floor
Boston, MA 02110
Telephone: 617-960-3939
Facsimile: 617-449-6999


By: */s/ Brian D. Hershman*
    Brian D. Hershman
Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION,
as Trustee

35

ALSTON & BIRD LLP
KURT OSENBAUGH (SBN 106132)
*kurt.osenbaugh@alston.com*
WHITNEY CHELGREN (SBN 285362)
*whitney.chelgren@alston.com*
333 South Hope Street, Sixteenth Floor
Los Angeles, California 90071
Telephone:    213-576-1000
Facsimile:    213-576-1100


By: */s/ Kurt Osenbaugh*
    Kurt Osenbaugh
Attorneys for Plaintiff
WILMINGTON TRUST COMPANY and
WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Trustees

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 13-CV-3664-JCS

1

## <u>SIGNATURE ATTESTATION</u>

2    I, Bronwyn F. Pollock, attest that the concurrence in the filing of this Second Amended

3  Complaint has been obtained from Brian D. Hershman and Kurt Osenbaugh.

4

5                                    By:  */s/ Bronwyn F. Pollock*_____
                                          Bronwyn F. Pollock
                                    Attorneys for Plaintiff
6                                   THE BANK OF NEW YORK MELLON
                                    (f/k/a The Bank of New York) and THE BANK
7                                   OF NEW YORK MELLON TRUST
                                    COMPANY, N.A. (f/k/a The Bank of New York
8                                   Trust Company, N.A.), as Trustees

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28